Steve GARVEY, Petitioner–Appellant,

v.

Thomas T. ROBERTS, Arbitrator; Major League Baseball Players Association, Respondents–Appellees.

No. 98–55263.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 14, 1999

Filed Feb. 10, 2000

Neil Papiano, Iverson, Yoakum, Papiano & Hatch, Los Angeles, California, William F. Hertz, II, and Robert Brock, Yanz & Hertz, Glendale, California, for the petitioner-appellant.

Virginia A. Seitz, Sidley & Austin, Washington, D.C., for the respondents-appellees.

Before: REINHARDT and HAWKINS, Circuit Judges, and WHYTE,[1] District Judge.

Opinion by Judge REINHARDT; Concurrence by Judge MICHAEL DALY HAWKINS; Dissent by WHYTE.

REINHARDT, Circuit Judge:[2]

Former professional baseball player Steve Garvey ("Garvey") appeals the district court's denial of his Amended Motion to Vacate Arbitration Award. Garvey made his motion after an arbitrator confirmed the Major League Baseball Players Association's (the "Association") denial of Garvey's claim for damages from a settlement fund which was established after arbitration decisions finding that the Major League Baseball Clubs (the "Clubs") had engaged in collusion in the market for free agent services. Garvey contends that the district court committed reversible error by denying his motion to vacate for lack of subject matter jurisdiction with an alternative denial on the merits.

## I. BACKGROUND

A. The Grievances, Settlement Agreement and Framework

In 1986, 1987 and 1988, the Association filed grievances against the Clubs, alleging that the Clubs had violated the Collective Bargaining Agreement ("CBA") between the Clubs and the Association by engaging in collusion in the market for free agent services after the 1985, 1986 and 1987 baseball seasons. On December 21, 1990, after arbitration decisions finding that the Clubs had engaged in collusion and caused extensive damage to numerous players, the Association and the Clubs entered into a Global Settlement Agreement ("Settlement Agreement") to resolve the grievances. Pursuant to the Settlement Agreement,

---

1. Honorable Ronald M. Whyte, United States District Judge for the Northern District of California, sitting by designation.

2. Parts I and II.A were prepared by Judge Whyte, who is the author of the dissenting opinion. Judge Whyte graciously granted the majority permission to adopt these two sections, on which all members of the panel agree.

the Clubs established a fund of $280 million to be distributed to damaged players.

The Settlement Agreement provided that the Association would design a "Framework" "to establish an appropriate process for evaluation and determination of individual claims" for money from the fund. The Association issued a proposed Framework for resolution of claims to an independent arbitration panel for its consideration, and any player was permitted to file objections. On September 14, 1991, after hearings on players' objections to the Framework, the arbitration panel approved the Framework with amendments.

Players claiming damages from the collusion were required to file their claims by May 20, 1991.[3] The Association then began evaluating the claims pursuant to the Framework.

Under the Framework, as the Association concluded the evaluation of individual players' claims for a particular season or seasons, it was required to propose an overall distribution plan or a partial distribution plan for the claims relating to that season or seasons. Each recommended plan was then submitted to player claimants and the arbitrator. Player claimants or their agents could object to the Association's distribution plan recommendations, and the Association then responded by providing the arbitrator with a written statement of how it arrived at its proposed damage evaluation for that particular player. An objecting player claimant could then request oral argument before the arbitrator.

The Framework defines the responsibility and authority of the arbitrator with regard to review of a distribution plan as follows:

> ... the arbitrator shall determine only whether the approved Framework and the criteria set forth therein have been properly applied in the proposed Distribution Plan. The arbitrator may request such information from the Association or from any objectors which he deems necessary to make his determination.

> If the arbitrator determines that the approved Framework and the criteria set forth therein have not been properly applied with respect to any portion of a proposed distribution Plan, he shall have the authority to modify or amend the Distribution Plan to the extent necessary, in his judgment, to cure that defect. *IN DOING SO, THE ARBITRATOR MAY RAISE OR LOWER THE DAMAGE ALLOCATION AND/OR MAJOR LEAGUE SERVICE AWARD TO ANY PLAYER OR PLAYERS ....*

> The arbitrator shall promptly issue a written award regarding any proposed Distribution Plan after he has considered all objections and after he has conducted his own independent review, which award shall specify the specific damage allocation for each individual player claimant pursuant to the Distribution Plan. The content of the written award shall otherwise be subject to the sole discretion of the arbitrator. As mandated by the Settlement Agreement, all decisions of the arbitrator regarding any proposed Distribution Plan will be final and binding on all individual player claimants, the Association, the Major League Baseball Player Relations Committee and the Clubs.

(Emphasis in original).

## B. The Standard Under the Framework for Assessing Lost Contract Extension Claims

At issue in this appeal is Garvey's claim for damages resulting from an alleged lost contract extension for the 1988 and 1989 baseball seasons which Garvey claims resulted from the Clubs' collusion. Garvey's claim, which was based on his 1987 salary,

---

**3.** It is unclear to the court why the due date for submitting completed claims questionnaires preceded the issuance of the arbitration panel's opinion approving the Framework.

was approximately $3,000,000 for the two year period.

The Framework sets forth, at Section II, the standard for a player's recovery of damages for an alleged lost contract extension, as follows:

Some players who were under contract for a particular season believe that, but for the Clubs' collusion, they would have signed contract extensions (or better extensions than they actually signed) covering future seasons. *Although any player may file such a claim, the evidence indicates that there will be few potentially valid claims in this group.* Such a claim may be potentially valid if:

(a) the extension would have been signed after November 1, 1985; *and*

(b) the extension would have begun with the 1987 season or future seasons.

(Emphasis in original).

The Framework then sets forth at Section V, "Evaluation of Individual Player Claims," the following factors to be considered by the arbitrator, where applicable, in evaluating *all* player claims for money damages:

(a) the player's status, e.g., elected free agent; released free agent; non-tendered free agent; salary arbitration eligible;

(b) the player's Major League Service;

(c) the player's performance;

(d) the player's history of compensation;

(e) the salaries (and collusion claims, if applicable) of comparable players;

(f) collusion-free patterns of multi-year contracting, if applicable;

(g) the player's experience as a "new look" free agent, if applicable;

(h) the Guidelines Regarding Allocation of the Settlement Amount described below in Paragraph (3);

(i) the General Principles described below in Paragraph (4); and

(j) any other factor which would normally apply in the determination of a player's salary and other benefits in a collusion-free market, including but not limited to, those factors set forth in Article VI of the Basic Agreement.

The arbitrator further addressed the standard regarding lost contract extension claims in his February 14, 1994 award regarding Plan Distribution II:

It is clear that in the absence of collusion some of these players would have secured an extension to a multi-year contract signed prior to collusion but others would not have received such an opportunity with or without collusion. The task of identifying from the record those players who would fall in one or the other grouping is difficult. The demarcation must nevertheless be drawn and, in order to assign some continuity to the results, I agree with the approach of the Players Association in this regard, an approach which recognizes lost extension claims only in those cases where evidence exists that a specific offer of an extension was made by a club prior to collusion only to thereafter be withdrawn when the collusion scheme was initiated.

The arbitrator reiterated this standard in later denying Garvey's claim, further explaining that "in each of the few contract extension claims recognized it was 'shown that the club in question actually made a specific offer of a contract extension only to later summarily withdraw that offer pursuant to the scenario of the collusion program.'"

C.   The Garvey Arbitration

Garvey's contract with the San Diego Padres covered the years 1983–1987. Garvey claimed damages from the settlement fund based on his allegation that the Padres would have given him a two-year

contract extension for the years 1988 and 1989, but did not because of collusion.

On February 8, 1996, the Association released its proposed distribution plan covering the 1988 Claims. The plan awarded nothing to Garvey on his claim. In the period of almost ten years between the time the first collusion grievance was filed and the issuance of the 1988 distribution plan, Garvey did not present the Association with any evidence that the Padres actually offered to extend his contract. Garvey objected, and a hearing was held before the arbitrator on July 2, 1996.[4]

At the arbitration hearing, Garvey testified that the Padres made a pre-collusion offer in September 1985 to extend his contract for the 1988 and 1989 seasons, and that the Padres subsequently withdrew that offer because they had begun colluding with other teams. Garvey presented at the July 2, 1996 hearing, for the first time, a June 28, 1996 letter from Ballard Smith, the President/CEO of the Padres in the period 1979–1987. Smith's letter states that before the end of the 1985 season Smith made an offer to Garvey to extend his contract through the 1989 season, but that the Padres would not thereafter negotiate with Garvey due to their policy of collusion. Smith's letter states that "[t]here is no question in my mind that the reason the Padres withdrew their offer to Steve Garvey to sign a contract extension with the Padres was due to the collusion among the Clubs."

At the Association's request, the arbitrator granted a 21–day recess, requesting that both parties initiate a diligent effort to identify and produce documentation that could assist him in determining "what actually took place" from 1984 on with regard to the potential of an extension. After the recess, the Association submitted to the arbitrator the following additional evidence:

(1) The responses Garvey and his representatives submitted to claims questionnaires in 1988 and 1991. Garvey's response did not assert an actual offer, but rather asserted that it "would have been reasonable" for the Padres to pursue an extension. The response also described negotiations toward the end of 1986 in which the Padres indicated that they were interested in retaining Garvey beyond the 1987 season but declined to talk about an extension until a later date.

(2) Portions of Smith's November 1986 testimony in the collusion hearings, later cited by the arbitrator in his award, in which Smith denied collusion and testified that the Padres would not "sign [Garvey] today."

(3) A letter from Garvey's agent, Jeremy Kapstein. The letter stated that "as [Garvey] told the arbitrator ... he wanted to handle his own discussions with the Padres about an extension." Kapstein's letter made clear that Garvey then did so, and also stated that Smith had confirmed to the agent that Smith and Garvey were conducting contract discussions by themselves. According to the letter, Smith also told Kapstein he was hopeful that a direct negotiation would result in a contract extension. Kapstein's letter goes on to state that sometime later on, Garvey told him that the dialogue with Smith was "stalled" and asked for Kapstein's help. When Kapstein then talked with Smith, Smith said that Club policy had changed and he was not interested in talking with Garvey about an extension.

(4) Notes of the Association's Sept. 13, 1996, telephone interview with Smith. In the interview, Smith again stated that he had offered Garvey a contract extension sometime after the All–Star break in 1985, and that the offer had been withdrawn as a result of the collusion between the

4. Arbitrator Thomas T. Roberts has been dismissed as a defendant to this action.

clubs. In addition, Smith admitted that he had not told the truth about the collusion in the 1986 hearings. Finally, Smith described the reason why he came forward during Garvey's arbitration to provide new evidence: he said that although he has had no relationship of any kind with Garvey for the past seven or eight years and his only relationships during that period have been with friends in ownership, he felt compelled to offer the evidence pertaining to Garvey's claim to "right what I feel was a wrong I participated in against Steve."

In his May 1, 1997 award addressing fifty-eight players' claims, the arbitrator sustained several players' objections to the plan distribution, but denied Garvey's. The arbitrator's award dedicated over five pages to discussion of Garvey's claim and the Association's denial of it. The arbitrator's discussion noted Garvey's testimony regarding the circumstances of the alleged offer and withdrawal. The arbitrator cited the letter from Smith and quoted its assertion that the offer was withdrawn due to collusion. The arbitrator wrote that this statement, "taken on its face, appears to support the position of Garvey advanced in this proceeding." The arbitrator nonetheless concluded that "[t]here exists, however, substantial doubt as to the credibility of the statements in the Smith letter." The arbitrator quoted Smith's testimony from the 1986 collusion proceedings in which Smith had stated that the Padres were not in fact interested in continuing Garvey's contract in 1986 and that there had been no collusion. The arbitrator determined that

> [i]n light of the stark contradictions between the contents of the recently produced letter from Smith and his earlier sworn testimony that the Padres were not interested in re-signing Garvey, I must reject his more recent assertion that Garvey did not receive an extension to his contract covering the 1988 and 1989 seasons because the Padres were forced by the other owners to participate in the collusion scheme.

The arbitrator found that, "[w]hile Garvey and Smith may well have discussed the possibility of a contract extension," the scenario presented "does not meet the test established by the award of February 14, 1994," namely, the requirement of a "specific offer of an extension" made prior to collusion "only to thereafter be withdrawn when the collusion scheme was initiated." The arbitrator concluded that

> [t]he shadow cast over the credibility of the Smith testimony coupled with the absence of any other corroboration of the claim submitted by Garvey compels a finding that the Padres declined to extend his contract not because of the constraints of the collusion effort of the clubs but rather as a baseball judgment founded upon his age and recent injury history. The claim of Garvey for 1988 lost salary damages must therefore be denied.

### D. The District Court Proceeding

Garvey filed a Motion to Vacate Arbitration Award in district court in response to the arbitrator's denial of his claim, asserting jurisdiction under 28 U.S.C. § 1332(a)(1) and Section 10 of the Federal Arbitration Act. However, in his brief in opposition to the Association's motion to dismiss, Garvey added a further allegation of jurisdiction under Section 301 of the LMRA, which provides, at subsection (a):

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). The court allowed Garvey leave to amend to properly assert jurisdiction.

Garvey thereafter filed, on November 3, 1997, an Amended Motion to Vacate Arbitration Award, again asserting jurisdiction under Section 301 of the LMRA. Garvey's motion argued that the award should be vacated because the arbitrator's decision did not draw its essence from a collectively bargained agreement and exceeded the arbitrator's authority.

In a November 24, 1997 tentative ruling, the district court stated that it was inclined to dismiss Garvey's amended motion for lack of subject matter jurisdiction and, in the alternative, that it was inclined to deny the motion on the merits based on a proper application of the standard of review of the arbitrator's decision. The court ruled from the bench during the November 24, 1997 oral argument, stating that "it's not an easy case because of subject matter jurisdiction. But as I said in my tentative, the movant failed to meet the requirement of jurisdiction under 29 USC 185." The court continued that, "[a]ccordingly, the matter should be dismissed for want of subject matter jurisdiction. But then to go on further, the court doesn't feel comfortable in upsetting the arbitrator's decision. He heard the case, and he made his decision, and I think he was correct." The court's December 8, 1997 order denied Garvey's motion "for the reasons stated on the record on November 24, 1997." Garvey thereafter filed his notice of appeal.

## II. ANALYSIS

### A. Jurisdiction

■ The question of whether a district court has jurisdiction over a matter is reviewed *de novo*. *See Wilson v. A.H. Belo Corp.*, 87 F.3d 393, 396 (9th Cir.1996). Jurisdiction is proper under LMRA § 301(a) where (1) the suit is based on an alleged breach of contract between an employer and a labor organization and (2) the resolution of the lawsuit is focused upon and governed by the terms of the contract. *See Painting and Decorating Contractors Ass'n of Sacramento, Inc. v. Painters and Decorators Joint Committee of the East Bay Counties, Inc.*, 707 F.2d 1067, 1071 (9th Cir.1983). Section 301 is "not to be given a narrow reading." *Smith v. Evening News Ass'n*, 371 U.S. 195, 199, 83 S.Ct. 267, 270, 9 L.Ed.2d 246 (1962).

■ Individual employees can invoke Section 301 jurisdiction to assert their rights under an agreement between an employer and a labor organization. *See id.* at 200–201, 83 S.Ct. at 270. Moreover, a "contract" under Section 301 can extend to documents beyond the collective bargaining agreement itself, as separate documents are often used to define the rights and obligations contemplated in a single contract. *Alvares v. Erickson*, 514 F.2d 156, 161 (9th Cir.1975). The court in *Alvares* therefore found that the word "contract" as it appears in Section 301(a) encompassed the provisions of a welfare trust which had been established as a supplement to and referred to in a collective bargaining agreement. *See id.* Likewise, a suit regarding individual rights to pension benefits that are deemed to "arise" from a collective bargaining agreement falls under Section 301(a). *See Rehmar v. Smith*, 555 F.2d 1362, 1367 (9th Cir.1976). Similarly, in *O'Hara v. District No. 1–PCD*, 56 F.3d 1514 (D.C.Cir.1995), the D.C. Circuit held that union members' claims that the union breached the collective bargaining agreement by failing to distribute moneys which the union received pursuant to an arbitration award fell under Section 301.

■ Garvey's motion to vacate the arbitration award alleges that the arbitrator violated the Framework when he denied Garvey's claim. Although, taken alone, the Framework is not an agreement between an employer and a labor organization, it is a set of rules and guidelines developed pursuant to a settlement agreement between an employer and a labor

organization, designed as a means to distribute moneys paid as a result of the employer's established breach of a collective bargaining agreement. As in *Rehmar*, the right which Garvey seeks to vindicate, namely, his right to payment for alleged damages caused by collusion, "arises from" the CBA, for his right to be free from the effects of collusion is founded in the CBA. Garvey claims that his request for moneys from the settlement fund was wrongfully denied. His claim is premised on rights set forth in the CBA and the Settlement Agreement which followed it, and is thus properly brought under Section 301 of the LMRA.

## B. The Arbitration Award

█ In reviewing the merits of Garvey's challenge to the arbitrator's award, we start with the proposition that judicial review of an arbitrator's decision in a labor dispute is extremely limited. Our deferential approach to judicial review found its first important expression in three 1960 Supreme Court cases that have come to be known as the "Steelworkers Trilogy." *See Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). In those cases, the Court explained that a collective bargaining agreement is "more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *Warrior & Gulf Navigation Co.*, 363 U.S. at 578, 80 S.Ct. 1347. The Court went on to state that because the arbitrator is the one chosen to implement the collective bargaining agreement's system of self-government, "[i]t is the arbitrator's construction [of the agreement] which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpreta-

tion of the contract is different from his." *Enterprise Wheel & Car Corp.*, 363 U.S. at 599, 80 S.Ct. 1358. *Accord Federated Dept. Stores v. United Food & Comm. Workers Union, Local 1442*, 901 F.2d 1494, 1496 (9th Cir.1990). More recently, the Court has reiterated the deference due to an arbitrator's award: "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers Intl. Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987).

█ In *Enterprise Wheel & Car Corp.*, the Supreme Court set forth one of the exceptions to the general rule of outright refusal to review the merits of arbitrators' awards. The general rule, the Court noted, is inapplicable when an arbitrator "dispense[s] his own brand of industrial justice." 363 U.S. at 597, 80 S.Ct. 1358. In those instances—instances in which, by definition, an arbitrator's award draws no legitimacy from the collective bargaining agreement—a court has no choice but to refuse enforcement of the award. Over the years, we have formulated this exception in various ways. *See, e.g., SFIC Properties, Inc. v. International Assn. of Machinists & Aerospace Workers, Dist. Lodge 94*, 103 F.3d 923, 925 (9th Cir.1996) (stating that the exception applies "when the award does not 'draw its essence from the collective bargaining agreement' "); *Sheet Metal Workers v. Arizona Mechanical & Stainless, Inc.*, 863 F.2d 647, 653 (9th Cir. 1988) (suggesting that the exception applies where the award does not "represent[ ] a plausible interpretation of the contract"). Although the formulations have been various, the underlying rule has remained unchanged. We overturn an arbitrator's award only when it is clear from the arbitral opinion or award that the arbitrator did not base his decision on an interpretation of the collective bargaining agreement or that he disregarded what the

parties put before him and instead followed his own whims or biases.[5]

■■■■ Even this narrow exception to the rule of deference comes with a caveat: we will not overturn an arbitrator's decision on the ground that his written explanation of an award fails to show how the award is based on an interpretation of the collective bargaining agreement. Because arbitrators generally operate in an ad hoc manner with informal procedures, "[w]e do not require labor arbitrators to make the sorts of explicit or exhaustive 'findings of fact' we demand of district courts; likewise, the reasons for arbitral rulings need not be spelled out in detail. Indeed, '[a]rbitrators have no obligation ... to give their reasons for an award' at all." *Stead Motors*, 886 F.2d at 1206 (quoting *Enterprise Wheel & Car Corp.*, 363 U.S. at 598, 80 S.Ct. 1358). Thus, ambiguity in an opinion that accompanies an award, or a lack of any real opinion at all, is not sufficient to permit an inference that the arbitrator exceeded his authority. *See Enterprise Wheel & Car Corp.*, 363 U.S. at 598, 80 S.Ct. 1358; *Stead Motors*, 886 F.2d at 1208. When an arbitrator does give reasons for a decision, however, we must accept those reasons as the basis for the award. To do otherwise would undermine the system of deference that governs our method of review.

■■■ In the present case, accepting Arbitrator Roberts's reasons as the basis for the award leads us inexorably to the conclusion that in reaching his decision the arbitrator "dispensed his own brand of industrial justice." [6] The arbitrator denied Garvey's claim for the reason that Ballard Smith's "testimony" regarding Garvey's contract negotiations at the 1996 individual claim proceeding was "in stark contradiction" to the statements Smith made in his capacity as the San Diego Padres' President and Chief Executive Officer at the infamous 1986 collusion hearing. Based on this contradiction, the arbitrator credited the version of events described by Smith at the earlier collusion hearing and, accordingly, concluded that both Smith's and Garvey's testimony at the later proceeding was false. To understand why this decision can only be explained as an attempt by the arbitrator to dispense his own brand of industrial justice, we must review the context in which he reached his extraordinary conclusion.

As explained above, the present individual claim proceeding arose out of an earli-

---

5. Our circuit has identified two other exceptions to the general deference to an arbitrator's award: when the arbitrator exceeds the scope of the issues submitted, and when the award runs counter to public policy. *See SFIC Properties, Inc.*, 103 F.3d at 925.

6. We disagree with the dissent's attempt to justify the award on the basis of Garvey's earlier claims questionnaires, in which he did not indicate that he had been offered a contract extension prior to the period of collusion. Our dissenting colleague apparently believes that the arbitrator could have validly relied on the contents of the claims questionnaires as a basis for concluding that no offer was in fact made. We cannot agree that the arbitrator's decision may be affirmed on that basis: the record contains no indication that the arbitrator relied on the questionnaires, and it would have been improper for him to have done so. First, the arbitrator's decision makes no mention of the questionnaires, and relies instead on the statements made by Bal-

lard Smith at the 1986 collusion hearing. Second, the arbitrator could not properly have relied on the claims questionnaires, because the arbitrator himself had previously established a procedure governing the hearings under which the questionnaires could not be considered. In setting forth the rules to be applied to his evaluation of players' claims, the arbitrator held that he would "treat[ ] those claims of the objecting players advanced in writing and/or at oral argument as definitive of their position rather than potentially conflicting claims they may have advanced earlier in [the claim resolution] procedure." In response to a question from Garvey's counsel during Garvey's hearing, the arbitrator made it clear that under this previously established policy he would not consider "conflicting positions which might have been taken earlier, such as in the claims questionnaires." Garvey's counsel was entitled to rely on this representation, and indeed appears to have done so.

er finding by a panel chaired by the same arbitrator, Thomas Roberts, that the baseball club owners had colluded over a period of time to depress player salaries and deprive highly paid players such as Garvey of their economic rights. After the club owners were found liable, they settled the damages claim by setting aside two hundred eighty million dollars for the benefit of the players who were the victims of their collusive activities. The arbitrators reached their finding of collusion following hearings in which various owners, including Smith, testified under oath that no collusion of any kind had occurred. During those hearings, Smith was asked to explain what reason there could possibly be, absent collusion, for the Padres' decision not to re-sign Garvey. In response, Smith stated that the Padres were simply no longer interested in Garvey's services as a player because the "Club [was] at a different point" than it had been at when it signed him in 1982. Smith also testified that the Padres' contract decisions during the period of alleged collusion were the product of nothing "but [his] own individual club judgment about the best interests of the Padres." After considering Smith's testimony and similar testimony from other owners, the arbitrators, headed by Chairman Roberts, rejected the owners' contentions and held that they had indeed colluded to depress player salaries and deprive players of their rightful incomes.

Ten years after the finding of collusion, Garvey's individual claim proceeding was conducted. Smith was the key witness on behalf of Garvey.[7] In spite of his determination in the earlier arbitration that the testimony of the owners (including Smith) had been false, and in spite of the fact that the owners' testimony had been deliberately designed to cover-up their invidious scheme, the arbitrator rejected Garvey's claim on the ground that Smith's 1986 testimony had, in effect, been truthful. In doing so, the arbitrator first grudgingly

acknowledged that, "taken on its face, [Smith's 1996 letter] appears to support the position of Garvey advanced in this proceeding." In fact, the letter does far more than appear to support Garvey's position. It unequivocally endorses Garvey's testimony in every respect: the letter states explicitly that Smith made Garvey an offer before the end of the 1985 season—an offer that the letter states was subsequently withdrawn "due to the collusion among the clubs." After making his grudging half-way concession regarding the contents of Smith's 1996 letter, the arbitrator proceeded to quote extensively from the statements made by Smith during the 1986 collusion hearings. These statements had, of course, been made for the sole purpose of supporting the owners' attempt to deceive the arbitrators—an attempt that the arbitration panel had squarely rejected. Nevertheless, because of "stark contradictions between the contents of the recently produced letter from Smith and his earlier sworn testimony that the Padres were not interested in re-signing Garvey," the arbitrator proceeded to reject Smith's confession of collusion as false and to accept his earlier denials of collusion as true.

Under ordinary circumstances, we would accept a conclusion by the arbitrator that Smith told the truth in his 1986 testimony and lied in his 1996 letter even if that conclusion were clearly erroneous. *See Sheet Metal Workers v. Arizona Mechanical & Stainless, Inc.*, 863 F.2d 647, 653 (9th Cir.1988). We are presented, however, with the extraordinary circumstance in which the arbitrator's own rulings make clear that, more than being simply erroneous, his finding is completely inexplicable and borders on the irrational. In this circumstance, given the arbitrator's professional experience, the decision can be explained only by his desire to dispense his

---

**7.** The claim procedure was very informal. Smith's evidence was provided by letter and telephone call, the latter being reported in a communication from the Players' Association. Yet, Smith's evidence was afforded the same dignity as other evidence provided in person.

own brand of industrial justice. No other plausible explanation exists.

As the earlier discussion of the collusion proceedings explains, the panel of arbitrators headed by Arbitrator Roberts had previously ruled that the 1986 testimony by the owners, including Smith, was untruthful. The owners' testimony during those hearings had been designed for the sole purpose of convincing the arbitrators that no collusion had taken place, and the arbitrators had concluded that the owners' testimony was not true. In light of that conclusion, Arbitrator Roberts' determination in Garvey's individual claim proceeding that Smith's (false) 1986 collusion testimony somehow precluded the crediting of his (truthful) confession in 1996 is, to say the least, bizarre.

The owners' mendacity in their 1980's collusive efforts to depress the ballplayers' income was in many ways as damaging to baseball as the Black Sox scandal of 1919.[8] The scope of the owners' deceit and fabrications in their 1980's effort to cheat their employees out of their rightful wages was wholly unprecedented, as was the financial injury suffered by the ballplayers. That the arbitrator would in these circumstances rely on Smith's statements made in the collusion hearing, and on the basis of those false statements reject Smith's later effort to remedy the injury he had caused, surpasses understanding. The only inference that can fairly be drawn from the arbitrator's current crediting of Smith's earlier perjurious testimony is that

the arbitrator was attempting to "dispense his own brand of industrial justice." For this reason, we decline to enforce his award.

We emphasize that the dispositive determination in this case is without any question the arbitrator's rejection of Smith's "testimony" on the ground that it conflicted with his earlier testimony on behalf of the owners. At the later hearing, Smith's and Garvey's descriptions of the events that occurred were entirely consistent: both agreed that an extension offer had been made and subsequently withdrawn. While the arbitrator purported to rely on the lack of credibility of "the Smith testimony," "coupled with the absence of any other corroboration ... submitted by Garvey," the lack of "other" corroboration simply bolstered, in the arbitrator's view, his previously made decision not to credit Smith's testimony. It therefore adds nothing to that decision. Moreover, the record fully explains why Smith's evidence was the only direct evidence corroborating Garvey's testimony. Garvey's agent submitted evidence that Garvey and Smith negotiated directly regarding the extension, without any third-party assistance. The arbitrator simply disregarded the record when he added his "absence of corroboration" assertion.

We should also stress that while the falsity of Smith's 1986 testimony is readily apparent from the outcome of the collusion hearing, the truthfulness of Smith's state-

---

**8.** It is interesting to note that many historians believe that the Black Sox scandal was itself the product of the economic exploitation of baseball players by a baseball club owner. The 1919 White Sox (known after the scandal as the Black Sox) were the best team in baseball that year, but the team was also one of the worst paid. The then-nonunionized players' salaries were so low because the players had been forced to sign contracts containing a "reserve clause," which prevented them from changing teams without the permission of the owner. (In effect, these reserve clauses operated in a manner similar to the owners' collusive practices in the mid-eighties.) In addition to using these exploita-

tive contracts to depress player salaries, the owner of the team, Charles Comiskey, regularly cheated the players out of other benefits and bonuses. Many think it was this grossly unfair treatment that led the White Sox players, including Shoeless Joe Jackson, to throw the 1919 World Series for money. *See* Eliot Asinof, Eight Men Out (1962); *see also* Eight Men Out (Orion 1988). We might note, however, that the situation has changed dramatically in recent years: observers today would find little reason to complain that baseball's current salary structure is unfair to the players or that it results in inadequate salaries and signing bonuses for its top stars.

ments in Garvey's individual claim proceeding finds strong support in Smith's explanation of his reasons for coming forward when asked by the parties. In explaining the contradictions with his earlier testimony, Smith confessed that some parts of his 1986 testimony had been untrue, and that other parts had been "a little cute"—all in an effort to avoid acknowledging that he had made an offer to Garvey. He then went on to say that he felt compelled to offer evidence now "because he was trying to right what [he] fe[lt] was a wrong [he] participated in against [Garvey]." Finally, Smith noted that he had no relationship of any kind with Garvey for the past seven or eight years, and that his only baseball-related relationships during that period were with other baseball owners. No one has suggested that Smith had any motive to lie at the current hearing.

The unique character of the proceeding at issue in the present case may explain in part, if any explanation is possible, why Arbitrator Roberts dispensed his "own brand of industrial justice." In ordinary labor disputes, arbitrators have many institutional advantages that help ensure the legitimacy of labor arbitration awards. Garvey's proceeding, however, bears little resemblance to the proceedings customarily employed to resolve labor disputes. It lacked two important institutional safeguards present in the ordinary arbitral proceeding: the perspective provided by the adversarial process, and the guidance provided by an established law of the shop. By providing a reliable mechanism for finding facts and examining the strengths and weaknesses of conflicting arguments, the adversarial process, informal though it may be in the arbitration context, helps ensure that arbitral conclusions are sound. The present arbitration was unusual in that no such process existed: neither the baseball owners nor the Players' Association had a vested interest in whether a particular player received a portion of the fixed settlement fund. Similarly, there was no collective bargaining agreement to construe and no well-established law of the shop to help fill in the interstices. Instead, there was only a one time "Framework" for the arbitrator to implement.

While we set aside the award in this case, we consider the circumstances unique. We doubt that our decision will have any precedential value in cases involving more traditional methods of resolving disputes in the workplace. Certainly, we are aware of few, if any, cases in which arbitrators have dispensed their own brand of industrial justice in the ordinary arbitral process, or indeed in any proceeding. That such occurred here is regrettable, but fortunately not beyond repair.

## III. CONCLUSION

Based on the foregoing, the district court's denial of Garvey's Amended Motion to Vacate Arbitration Award is reversed.

REVERSED and REMANDED with directions to vacate the award.

HAWKINS, Circuit Judge, concurring:

I am delighted to join Judge Whyte with respect to Sections I (Facts & Procedural Background) and II A. (Jurisdiction) of the opinion. I am equally pleased to concur with Judge Reinhardt in Section II B. (The Arbitration Award) of the opinion. I write separately only to emphasize why I think the arbitrator's ruling is not entitled to the deference ordinarily accorded such decisions.

Imagine that Major League Baseball has decided to adopt a rule allowing video replay review of contested decisions and that we have been asked to review the home plate umpire's decision to call a particular pitch a strike. In the process of doing so, we are told we must apply a rule of substantial deference to the call on the field, that our job is not to overrule close calls, but only those that are so clearly and plainly wrong they cannot be rationally explained.

In that context, which I would argue is not unlike the standard of review of arbitration awards, I would certainly not overrule the strike call of an umpire where the pitch was right down the middle of the plate. Nor would I even consider overruling a strike call where the pitch was on the edge, or even close to the plate. And even if the umpire adopted, during the course of a game, a definition of the strike zone that was inconsistent with my own understanding of what the rules of baseball define as a strike, as long as the umpire applied anything even remotely approaching a consistent application of that definition, I would defer to it.

But if the videotape replay showed the catcher diving outside the batter's box to catch the pitch, I would overturn the umpire's decision in a New York minute. I would do so because the call on the field bore no reasonable relation to reality and, more importantly, because the integrity of the game—here, of course, not a game at all—would suffer if I did anything else.

And that appears to be precisely what happened here. The arbitration below arose out of an earlier finding by another arbitration panel—which this very arbitrator chaired—that the owners had in fact engaged in collusion. This finding was reached after various owners, including Ballard Smith, then President of the San Diego Padres Baseball Club, testified under oath that no collusion of any kind had occurred. Of specific importance to this matter, Smith also testified that he had not made Steve Garvey a contract extension offer.

After considering this evidence, the earlier arbitration panel found that indeed there was collusion among the owners—a conclusion that simply could not have been arrived at without disbelieving the testimony of club owners, including Ballard Smith, to the contrary. This defined the "strike zone" for the resolution of claims like those of Steve Garvey. And, by any fair application of that definition, evidence that admitted the existence of collusion and owned up to prior attempts to mislead the truth-seeking process was in the strike zone and evidence that did the opposite was outside it.

This is the call that this arbitrator had to make. Having concluded that collusion had indeed occurred, a fund of some $280 million having been created to satisfy collusion claims, it was this arbitrator's task to sort through claims by players and former players. Into that process returns Ballard Smith, now no longer affiliated with Major League Baseball or the San Diego Padres baseball club, who says, in effect, to the arbitrator: "You will undoubtedly recall my prior testimony, which you were obviously able to see through. I know this will come as no surprise to you when I now tell you that I lied. I lied about not having made Steve Garvey a contract extension offer, and I lied about the existence of collusion among the owners."

The collusion "strike zone" having been decided as it had, we might expect a fair-minded decision maker to have done one of two things. One would have been to simply accept that Smith had lied when it was in his, his baseball club's, and baseball team owners' best interest to do so. Those lies having now been exposed, we might have expected such an arbitrator to applaud Smith for his forthright admission of prevarication, accept the truth of what he was now saying and proceed to determine the value of Steve Garvey's claim. No reviewing panel of any kind, applying even the most rigorous standard of review, could have found fault with that approach.

The second thing the arbitrator might have done would have been to take a more cautious approach. Smith's later statement, after all, was not under oath, and it is one thing to say "I lied" in a letter or an interview and quite another to serve up a prosecutable case of perjury by admitting under oath that prior testimony was a knowing, deliberate, and premeditated falsehood. Recognizing this, the arbitrator

could have directed that Smith testify under oath concerning his more recent statements. And, if such a cautious arbitrator had done that, even though one might disagree with the end result—the "strike call" if you will—a reviewing authority would be required, I would think, to accept an arbitrator's weighing of the two sworn statements.

Unfortunately, neither occurred here and no standard of review, no rule of deference is so slavish as to require us to accept the conclusion of an arbitrator who says, in effect, "You lied before when you said there was no collusion, and I refused to rely on those lies in finding that there was collusion; but now that you are telling me that you did lie, that there really was collusion, I refuse to believe you." That is a pitch so far outside the strike zone that it is unworthy of deference, however defined.

WHYTE, District Judge, dissenting in part:

I dissent from the majority's conclusion that the arbitration award must be vacated (Part II.B.). I can understand why the majority believes the award is wrong and should be vacated, but I believe it has over-stepped our deferential review role in doing so.

A district court's review of arbitration awards is "both limited and highly deferential." *Sheet Metal Workers' Local 359 v. Madison Industries, Inc.*, 84 F.3d 1186, 1190 (9th Cir.1996). Thus, "an award must be confirmed if the arbitrators even arguably construed or applied the contract and acted within the scope of their authority." *Barnes v. Logan*, 122 F.3d 820, 821 (9th Cir.1997), *cert. denied*, 523 U.S. 1059, 118 S.Ct. 1385, 140 L.Ed.2d 645 (1998). "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements." *United Steelwork-*

ers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 596, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). A reviewing court is generally bound to defer to the decision of the arbitrator, even if that decision makes erroneous factual findings. See *Sheet Metal Workers v. Arizona Mechanical & Stainless, Inc.*, 863 F.2d 647, 653 (9th Cir.1988); *SFIC Prop., Inc. v. International Association of Machinists & Aerospace Workers, Dist. Lodge 94*, 103 F.3d 923, 924–25 (9th Cir.1996). The Third Circuit has summarized the extremely deferential standard of review as follows: "Our review of the arbitrator's factual findings is not whether those findings were supported by the weight of the evidence or even whether they are clearly erroneous. All that is required is some support in the record. When the court finds some support, the inquiry is over." *Tanoma Min. Co. v. Local Union No. 1269, UMWA*, 896 F.2d 745, 748 (3d Cir. 1990).

Courts have recognized exceptions to the general rule of deference to the arbitrator's decision, such as where the arbitrator "dispense[d] his own brand of industrial justice," as opposed to making an award that draws its essence from the collective bargaining agreement. *Enterprise Wheel and Car Corp.*, 363 U.S. at 597, 80 S.Ct. 1358. It seems to me that the majority here quarrels with the arbitrator's fact finding rather than finding the award does not draw its essence from the collective bargaining agreement.[1] In any event, the majority assumes that the arbitrator based his decision on Ballard Smith's 1986 testimony. However, the arbitrator stated that "[t]he shadow cast over the credibility of the Smith testimony *coupled with the absence of any other corroboration of the claim submitted by Garvey* compels a finding that the Padres declined to extend his contract not because of the constraints of the collusion effort of the

---

1. The award draws its essence from the Framework developed from the Settlement Agreement. The Settlement Agreement re-

solved the grievances arising from the owners' violations of the CBA.

clubs...." (Emphasis added). In other words, it appears the arbitrator felt that Smith's prior inconsistent testimony negated the credibility of his current testimony and, therefore, the probative value of it was outweighed by the conclusion that could be drawn from the lack of any corroboration that a specific extension offer had been made.

Significantly, no evidence other than Smith's arbitration statement corroborated Garvey's testimony that he had received a specific extension offer. Garvey submitted no documentation whatsoever evidencing a specific offer. The Association submitted to the arbitrator, after the 21–day recess, Garvey's responses to claims questionnaires which contain no mention of a specific offer. The 1988 questionnaire response states that "it would have been reasonable for the Club to pursue a contract extension." The 1991 questionnaire response states that Garvey and the Padres engaged in "contract extension negotiations" beginning toward the end of the 1986 season, at which point Smith told Garvey that "he would talk to him later because there was interest in Steve remaining with the Padres beyond 1987," and describes further talks with Smith in September, 1987 when, "[a]gain, Steve was told they would talk later." Although the questionnaire responses discuss circumstances surrounding failed contract extension negotiations, they never state that a specific extension offer was actually made. Garvey never told his agent that he had received a specific offer from the Padres. Admittedly, Garvey, rather than his agent, was dealing with Smith at the time of the alleged offer. However, when the negotiations "stalled" and Garvey brought in his agent, Garvey apparently said nothing to his agent about having received a specific offer.

The majority says that "the arbitrator could not properly have relied on the claims questionnaires, because the arbitrator himself had previously established a procedure governing the hearings under which the questionnaires could not be considered." Op. at 589 n. 6. The arbitrator did state at Garvey's hearing that he would not consider "conflicting positions which might have been taken earlier, such as in the claims questionnaires." I believe the statement is reasonably read as confirming what the arbitrator had said in his February 14, 1994 award, specifically, that he would regard the "claims of the objecting players advanced in writing and/or oral argument as definitive of their position rather than potentially conflicting claims that may have been advanced earlier in this entire procedure." That is, a player's current *claim* would define his position and the player would not be prejudiced by a previous conflicting *claim*. I do not read the arbitrator's statement as suggesting that he would not consider the lack of evidence corroborating a current claim or earlier conflicting *factual evidence*. Nor does the arbitrator's earlier statement preclude the use of conflicting factual statements to make credibility determinations.

I acknowledge that the evidence presented by Garvey at the arbitration supporting his claim that a specific extension offer was made to him is persuasive. However, our review must be highly deferential, and we should not vacate an award because we believe the arbitrator's factual findings are erroneous. Therefore, I believe the district court properly denied the motion to vacate the award and that its judgment should be affirmed.