276 F.3d 464 (9th Cir. 2001)
 TARIQ AHMED, MD, Plaintiff-Appellee,
v.
STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES; LEANNA LAMB, Superintendent Rainier School; ROGELIO RUVALCABA, Dr.; DOES 1 THROUGH 20, Defendants-Appellants.
 No. 00-35660
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted August 8, 2001
Filed August 28, 2001
Amended December 27, 2001
 
 Michael P. Lynch, Assistant Attorney General, Olympia, Washington, for the defendants-appellants.
 Charles K. Wiggins, Bainbridge Island, Washington, for the plaintiff-appellee.
 Appeal from the United States District Court for the Western District of Washington Jack E. Tanner, District Judge, Presiding, D.C. No.CV 97-5415 JET
 Before: John T. Noonan, A. Wallace Tashima, and Richard C. Tallman, Circuit Judges.
 
 
 1
 Opinion by Judge Tashima; Dissent by Judge Noonan
 
 ORDER
 
 2
 Judge Noonan's concurrence in the opinion, filed on August 28, 2001, and reported at 262 F.3d 979, is withdrawn and his separate, dissenting opinion is filed herewith.
 
 OPINION
 TASHIMA, Circuit Judge:
 
 3
 Plaintiff-Appellee Dr. Tariq Ahmed brought suit in federal district court against Defendants-Appellants Washington Department of Social and Health Services ("DSHS") and two of its supervisory employees under 42 U.S.C. 1983 for alleged violation of his First Amendment rights. He ultimately won a jury verdict for $8,026,009. We have jurisdiction over this appeal pursuant to 28 U.S.C. 1291, and we reverse.
 
 I. BACKGROUND
 
 4
 Most of the facts in this case are disputed and, on at least some issues, there may be inconsistent sets of facts that have been found by different tribunals, federal and state. For this reason, we begin with the procedural background.
 
 
 5
 Ahmed was terminated from his position with DSHS on January 10, 1997. Five days later, he appealed his termination to the state Personnel Appeals Board ("PAB"). On July 1, 1997, while the administrative appeal was still pending, Ahmed filed a complaint against DSHS and two of his superiors in federal district court. All of the claims in the complaint were, in one way or another, claims for wrongful termination, including a claim for wrongful termination in retaliation for the exercise of his First Amendment rights.
 
 
 6
 On December 19, 1997, the PAB decided Ahmed's appeal against him, and Ahmed appealed that determination in state court. Next, a federal jury returned a verdict in favor of Ahmed. Judgment on the verdict was entered on June 17, 1998, and the defendants appealed to this court. Meanwhile, the state trial court found against Ahmed, affirmed the decision of the PAB, and entered judgment on May 10, 1999. Ahmed appealed the decision to the Washington Court of Appeals.
 
 
 7
 Next, we reversed the district court's judgment in favor of Ahmed, on the basis of an erroneous evidentiary ruling, and the case was remanded for a new trial. Ahmed v. Washington, No. 98-36202, 1999 WL 1040086 (9th Cir. Nov. 16, 1999) (unpublished disposition). On retrial, another federal jury again found for Ahmed. Judgment on that verdict was entered on June 30, 2000, and it is the appeal from that judgment that is now before this court.[1]
 
 
 8
 After the notice of appeal from the second federal trial was filed, the state appeals court affirmed the decision of the state trial court, affirming the PAB decision that had gone against Ahmed. Ahmed v. Dep't of Soc. & Health Servs. , No. 24685- 6-II, 2000 WL 1174554 (Wash. Ct. App. Aug. 18, 2000) ("Ahmed I"). Ahmed's petition for review to the state supreme court was denied. Ahmed v. Dep't of Soc. & Health Servs., 16 P.3d 1265 (Wash. 2001).
 
 
 9
 On Ahmed's theory of the facts, this is essentially a whistleblower case -- Ahmed was terminated for speaking out about improper patient care at Rainier School, a DSHSrun residential facility for the disabled, at which Ahmed was employed. He claims that he was never disciplined until immediately after he filed a formal incident report about substandard care at the school. Because the presence of such reports in the school's records could jeopardize the school's federal funding, Defendant Leanna Lamb (the school's superintendent) and Defendant Dr. Rogelio Ruvalcaba (the school's clinical director) allegedly conspired to gather trumped-up disciplinary charges against Ahmed and fire him on that basis.
 
 
 10
 Defendants DSHS, Lamb, and Ruvalcaba (collectively "Defendants") argue to the contrary. On their theory of the facts, this case is a straightforward termination for cause. They claim that Ahmed was fired for a number of legitimate reasons. They also argue that the record shows that Ahmed's problems working with others long predate his alleged whistleblowing.
 
 
 11
 On appeal, the parties argue the facts of the various incidents at issue in great detail. Fortunately, we need not attempt to reconcile those conflicting positions because the dispositive issue presented by this appeal is the limits of the district court's jurisdiction.
 
 
 12
 The PAB, in its review of Ahmed's termination, found against Ahmed on most of the charges. It further found that these were legitimate bases for Ahmed's termination, and it upheld the termination on that ground. All of the PAB's find- ings of fact and conclusions of law, reviewed under appropriate standards, were affirmed by the state courts.
 
 II. ANALYSIS
 
 13
 As a general matter, lower federal courts do not have authority to review final determinations of state courts. Rather, the only federal forum in which such review can be sought is the United States Supreme Court. See Worldwide Church of God v. McNair, 805 F.2d 888, 890 (9th Cir. 1986) (citing 28 U.S.C. 1257). The Rooker-Feldman doctrine is merely a development of those principles: A federal district court does not have jurisdiction to hear a case that would require the court to review a state court judgment, even if the case presents federal constitutional issues, and even if the state court judgment is not from the state's highest court. See Dubinka v. Judges of the Superior Court, 23 F.3d 218, 221 (9th Cir. 1994); Worldwide Church of God, 805 F.2d at 890, 893 (applying the doctrine to a case in which the appeal of the relevant state trial court judgment was still pending); see generally Dist. of Columbia Court of Appeals v. Feldman , 460 U.S. 462 (1983); Rooker v. Fidelity Trust Co. , 263 U.S. 413 (1923). The doctrine encompasses cases in which the issues presented to the federal court are not identical to but are "inextricably intertwined" with determinations made by the state court. See Feldman, 460 U.S. at 483-84 n.16; Dubinka, 23 F.3d at 221-22. It also applies to prohibit federal judicial review of state court review of determinations made by state administrative bodies. Feldman, 460 U.S. at 468, 485-86 (applying the doctrine to a decision of the District of Columbia Court of Appeals, upholding a decision of the Committee on Admissions of the District of Columbia Bar).
 
 
 14
 Rooker-Feldman is jurisdictional. See Olson Farms, Inc. v. Barbosa, 134 F.3d 933, 937 (9th Cir. 1998). It consequently cannot be waived. See Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."). The existence of subject matter jurisdiction is a question of law reviewed de novo. Garvey v. Roberts, 203 F.3d 580, 587 (9th Cir. 2000).
 
 
 15
 In Ahmed's case, the state trial court's affirmance of all of the findings of fact and conclusions of law of the PAB occurred before the second federal jury rendered its verdict. If Ahmed's federal case involved the relitigation of issues already determined by the PAB and, hence, by the state court, or if it involved the litigation of issues that were inextricably intertwined with such issues, then the district court was deprived of subject matter jurisdiction, once the state trial court rendered its decision. In effect, this would mean that Defendants won the "race to judgment" that we recently alluded to in Green v. City of Tucson, No. 99-15625, 255 F.3d 1086, 1097(9th Cir. July 9, 2001). The first judgment, which was in federal court, was reversed on appeal, and the next judgment, which was in state court and has survived all appeals, was in Defendants' favor.
 
 
 16
 On the facts of this case, the question of whether Ahmed's federal suit involves issues that are identical to or "inextricably intertwined" with issues already determined by the PAB (and hence by the state trial court) is a close one. The only claim in Ahmed's federal suit that went to the jury was his First Amendment retaliation claim. The PAB decision does not mention any First Amendment issues or state that Ahmed made any such arguments.[2] The letter opinion of the state trial court is similarly silent on the First Amendment, although the issue was at least briefly presented to the court orally by Ahmed's counsel. Had there been nothing further to consider, all of this might suggest that the merits of Ahmed's federal claim were not determined by the state court, and that the district court therefore had jurisdiction to hear it.
 
 
 17
 We conclude, nonetheless, that Ahmed's federal claim presents issues that are at least inextricably intertwined with, if not identical to, those adversely decided by the state court; thus, that the district court lacked jurisdiction. When the Washington Court of Appeals affirmed the state trial court's decision, it stated that Ahmed had
 
 
 18
 argued to the [PAB] that Superintendent Lamb initially contemplated a short suspension but was `angry and offended by her belief that Dr. Ahmed was creating difficulty for Rainier School over issues of client care with outside agencies reviewing the situation at Rainier School.' He suggested that, if Lamb's anger was a substantial factor in the decision to terminate Ahmed, her decision was inappropriate and a violation of his first amendment rights.
 
 
 19
 Ahmed I, 102 Wash.App. 1002, 2000 WL 1174554, at *11. The court went on to conclude (1) that Ahmed "has not shown that his speech was a substantial motivating factor in the termination decision," and (2) that the PAB had determined that Lamb terminated him for legitimate reasons. Id. (describing the alleged misconduct, stating that "[f]or these reasons,[Lamb] decided to terminate [Ahmed]," and concluding that the PAB "believed Lamb's reasons for termination were legitimate"). Thus, as we read the Washington Court of Appeals' opinion, Ahmed's First Amendment claim was considered and rejected by the PAB -- it rejected his argument that Lamb fired him in retaliation for speaking out about patient care problems, and it determined that her actual reasons for firing him were legitimate.
 
 
 20
 Ahmed I was decided after the second jury verdict in Ahmed's favor. But it is still relevant to the assessment of the Rooker-Feldman issue on this appeal because it definitively clarifies which issues were actually litigated by Ahmed before the PAB. According to the Washington Court of Appeals, Ahmed presented his First Amendment claim to the PAB, and the PAB rejected it, finding that he was terminated, not in retaliation for the exercise of his First Amendment rights, but only for legitimate reasons. A Washington trial court affirmed those findings in their entirety. It was not then open to Ahmed to ask a federal jury to find to the contrary. That is, although the district court had jurisdiction at the time that Ahmed's complaint was filed, the district court was deprived of jurisdiction under Rooker-Feldman as soon as the state trial court entered judgment against Ahmed.
 
 
 21
 Ahmed's principal argument against the application of Rooker-Feldman is that "a final judgment on the merits enforcing Dr. Ahmed's First Amendment rights was entered in federal court before any state tribunal had rendered a decision on the merits of that issue." Insofar as Ahmed is referring to the judgment on the first federal jury verdict, the statement is correct but irrelevant -- the first judgment was reversed on other grounds and is now of no effect. Insofar as he is referring to the judgment on the second federal jury verdict, the statement is mistaken -- as the Washington Court of Appeals found, Ahmed presented his First Amendment claim to the PAB, which rejected it, and the PAB's decision was affirmed by the state trial court before the second federal jury returned its verdict.
 
 
 22
 Ahmed also argues that Rooker -Feldman does not apply when "the state proceedings [are] ongoing. " It is true that Rooker-Feldman does not apply if no state court has yet issued a decision. But if the "proceedings are ongoing" only in the sense that the direct appeal from the final judgment of the state trial court is pending, then Rooker -Feldman does apply. Worldwide Church of God, 805 F.2d at 890, 893. Because the state trial court entered judgment before the second jury returned its verdict, Rooker-Feldman applies to Ahmed's case, even though the state appeal was pending when the verdict was rendered.
 
 
 23
 Alternatively, we hold that even if the PAB did not decide Ahmed's First Amendment claim itself, it did decide issues that are inextricably intertwined with that claim. In order to succeed on his First Amendment claim, Ahmed must prove that his speech was a substantial motivating factor in his termination. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). If he were to carry that burden, Defendants could still insulate themselves from liability by proving that they would have fired him for legitimate reasons if the proven retaliatory motive had not been present. Id.; see also Texas v. Lesage, 528 U.S. 18, 20-21 (1999). Thus, Defendants' reasons and motivations for firing Ahmed, and the legitimacy of those reasons, were all crucial to Ahmed's First Amendment claim. Consequently, throughout his federal suit he has sought to minimize his disciplinary problems, arguing the facts of all of the alleged instances of misconduct in great detail and seeking to explain away his alleged disciplinary violations. In effect, Ahmed argued to the federal jury that the disciplinary charges against him were largely manufactured or exaggerated by Defendants in order to get rid of him.
 
 
 24
 These arguments are necessary to the success of Ahmed's First Amendment claim, because he was required to show that his speech was a substantial motivating factor of his termination, and he needed to overcome Defendants' showing that without his speech, they would have fired him anyway. The problem is that all of these facts were already found by the PAB, and in Defendants' favor, and it rejected Ahmed's versions of the incidents in question. Because the facts found by the PAB thus go to the heart of Ahmed's First Amendment claim, we conclude that Ahmed's claim is inextricably intertwined with the PAB's factual findings, which were affirmed by the state trial court before the second federal jury returned its verdict. Under Rooker-Feldman, therefore, the district court did not have jurisdiction over Ahmed's suit.
 
 III. CONCLUSION
 
 25
 Because we conclude that the district court lacked jurisdiction at the time that it rendered its judgment, the judgment of the district court is VACATED and the case is REMANDED to the district court with instructions to DISMISS the action. Costs to appellants.
 
 
 
 Notes:
 
 
 [1]
 We have, in the meantime, dismissed a separate, prior appeal from a pretrial order of the district court on remand, because that order was not an appealable, final order.
 
 
 [2]
 Ahmed's Supplemental Excerpts of Record include a few pages of the transcript of the administrative hearing, and Ahmed relies on them as evidence that the PAB "specifically precluded [Ahmed] from asserting an issue relating to his First Amendment claims." The excerpt from the transcript does not support that claim.
 
 
 NOONAN, Circuit Judge, dissenting:
 
 26
 This case presents a quantum expansion of what is conventionally known as the Rooker-Feldman doctrine. It is an expansion as undesirable as it is unwarranted.
 
 FACTS
 
 27
 Testimony as to some of the following was in conflict. This summary presents what two federal juries must have found as fact in order to render two separate, substantial verdicts for Ahmed:
 
 
 28
 On May 20, 1994, Tariq Ahmed began work as a physician at the Rainier School for the disabled. On April 16, 1996, he filed a formal incident report noting that for five months Paul H's possible urinary tract infection had not been treated. He added that, during his two years at the school, 80% of the tests he had ordered for patients with diarrhea had not been performed.
 
 
 29
 Rainier was a state school with a large amount of federal funding. It had twice been decertified for such funding because of perceived deficiencies in its treatment of its patients. A formal incident report in its files was a threat to its funding, and Ahmed had been warned by the school's administration not to file such reports. He, on the other hand, believed that many of the disabled patients had difficulty protecting themselves, and that he should speak up for them.
 
 
 30
 After Ahmed had filed the incident report, he was summoned by Rogelio Ruvalcaba, the clinical director of the school, and told that the report jeopardized the school's funding, and he must withdraw it or "face the music. " When Ahmed did not respond, Ruvalcaba tore up the report and threw it in his wastebasket. Less than three weeks later, on May 15, 1996, Ruvalcaba filed a Personnel Conduct Report accusing Ahmed of "yelling" at a nurse. Ruvalcaba's report also implied that Ahmed had not responded to an emergency call from the nurse. Personnel Conduct Reports are supposed to be filed 14 days after the incident. This incident had occurred on July 17, 1995.
 
 
 31
 Another incident that had occurred on September 26, 1995 was now in May 1996 made by Ruvalcaba the subject of a Personnel Conduct Report. Two more reports referring to incidents on April 24, 1996 were also filed, plus one more of "yelling" at a nurse that had occurred on May 1, 1996. Only the last report complied with the rule as to the time for Personnel Conduct Reports to be filed. All five reports were filed on May 15, 1996 as Ruvalcaba's reaction to Ahmed's filing of his formal incident report on April 16, 1996.
 
 
 32
 On April 25, Ruvalcaba put Ahmed on "Alternative Assignment" with the clinical pharmacy. Three weeks later Ahmed was limited by Ruvalcaba to doing "only annual physical examinations." The timing of these unfavorable assignments was also triggered by Ahmed's unwelcome report.
 
 
 33
 On May 24, 1996, Ahmed filed a second formal incident report, noting that Albert J. had sustained a head injury but no doctor had been informed and no neurological test had been performed. Ruvalcaba told him that "again, the funding will be a problem." On May 29, 1996, at the suggestion of Leah Lamb, the superintendent of the school, Ruvalcaba assigned Ahmed "to do exclusive medical literature review. All issues pertaining to patient care are off limits."
 
 
 34
 On October 14, 1996, on the basis of the Personnel Conduct Reports, and after an investigation of them and a hearing, Superintendent Lamb determined that Ahmed had committed misconduct, and Ruvalcaba reported this finding to the Medical Quality Assurance Commission (the MQAC) of the state. On February 2, 1998, the MQAC informed Ahmed that it had investigated these charges and found that "the evidence does not support a violation" of the rules of professional conduct. Nonetheless, a year earlier, on January 10, 1997, Superintendent Lamb had dismissed Ahmed as a physician at the school, basing the dismissal on the same charges later dismissed by the MQAC.
 
 PROCEEDINGS
 
 35
 Ahmed was informed in the letter of dismissal that he might appeal the dismissal to the Personnel Appeals Board (the PAB) of the state within 30 days. Ahmed did so.
 
 
 36
 On July 1, 1997, before any hearing was held by the PAB, Ahmed filed his complaint in this case. He asserted both state and federal claims, including a violation of his rights under the First Amendment contrary to 42 U.S.C. § 1983. The state, answering for all defendants, did not ask the federal court to abstain, but did plead its immunity as a sovereign.
 
 
 37
 October 29 and 30, 1997, the PAB held a hearing on Ahmed's appeal of his dismissal. The sole respondent in the case was the state Department of Social and Health Services. On December 19, 1997, the PAB rendered its decision. It described the case as "an appeal from a disciplinary sanction of dismissal." Its opinion devoted considerable attention to the alleged lateness of the complaints against Ahmed. The opinion had one section entitled "Arguments Of The Parties." This section noted that Ahmed had made three arguments, viz. that his hearing disability affected his ability to modulate his voice; that he had given an adequate medical explanation for each of the incidents in which he was involved; and that staff, clients and clients' families had commended his "high standard of practice, care, and tenderness." Accepting the testimony offered by the defendant department, the PAB upheld his dismissal. Its decision made no reference to the First Amendment or section 1983. Ahmed appealed to the state superior court.
 
 
 38
 Proceedings continued in the federal district court. The pretrial order, agreed to by the parties, dropped the defendants' claim of sovereign immunity. The case went to trial before a jury, which found that the defendants had retaliated against Ahmed for the exercise of his First Amendment rights. On June 17, 1998, judgment was entered in his favor. The defendants appealed to us.
 
 
 39
 On May 5, 1999, the Superior Court of Thurston County issued an order by which the decision of the PAB was"affirmed in its entirety." No reference was made to any federal claim, and, of course, no federal claim had been treated by the decision. A letter dated February 4, 1999, from the court to counsel for all parties, giving the basis of the court's decision, stated that it found the PAB's decision, "not willful and unreasonable action." Ahmed appealed this order to the state Court of Appeals.
 
 
 40
 On November 16, 1999, we reversed the judgment for Ahmed, finding that the district court had erroneously excluded non-party witnesses offered by the defendants. We remanded for a new trial.
 
 
 41
 On May 11, 2000, the defendants moved for summary judgment on the basis of "res judicata, collateral estoppel and ultimately Rooker-Feldman." The motion was denied as untimely. The defendants appealed to this court. On June 16, 2000, we noted that the district court's denial did not seem to be a final appealable or collateral order. The appellants were ordered to move for voluntary dismissal or show cause why the appeal should not be dismissed for lack of jurisdiction of the appeal. Implicit in this order was that, despite the invocation of Rooker-Feldman, there was jurisdiction in the federal district court.
 
 
 42
 On June 19, 2000, the second trial in the district court began. The state moved to dismiss for lack of jurisdiction on the basis of Rooker-Feldman. The motion was denied. At the conclusion of the evidence the state again moved to dismiss on the grounds of Rooker-Feldman, collateral estoppel, failure to make a prima facie case, and qualified immunity. The motion was denied. On June 30, 2000, the jury returned a verdict for Ahmed, and judgment was entered in his favor. The court also issued an order restoring him to his position at the Rainier School.
 
 
 43
 On August 18, 2000, the state Court of Appeals affirmed the decision of the Superior Court for Thurston County. In passing, the court stated that Ahmed's "first amendment rights" had been mentioned in argument to the PAB. It is not evident where the court derived this information. The court itself held that his speech was not "a substantial motivating factor in the termination decision." Ahmed , 2000 WL 1174554 at *11 (Wash. App. Div. 2 2000). Ahmed filed a petition for review with the Washington State Supreme Court. On January 9, 2001, that court denied review.
 
 
 44
 The defendants appeal the district court's judgment of June 30, 2000.
 
 ANALYSIS
 
 45
 On two separate and roughly parallel tracks Ahmed pursued two related goals: in the state system, reversal of his dismissal and reinstatement; in the federal courts, damages for violation of his civil rights and reinstatement. The state court had only the Department of Social and Health Services as a defendant. The federal case was against the department and Ruvalcaba and Lamb. To avoid being sued in two forums, the defendant department could have requested the federal court to stay the federal proceedings until the state proceedings were completed. See Colorado River Water Conservation District v. United States, 424 U.S. 800, 817-19 (1976); Travelers Indemnity Co. v. Madonna, 914 F.2d 1364 (9th Cir. 1990) (explaining Colorado River Water factors to be considered); see also Quackenbush v. Allstate Ins. Co. , 517 U.S. 706, 721 (1996) (noting that in action for money damages such stays need not amount to dismissals). The defendants did not move to stay. Instead, at the start, they accepted the litigation in both state and federal forums.
 
 
 46
 Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923) held that Congress had not given appellate jurisdiction to a federal district court to hear an appeal from the judgment of a state court. Sixty years later, District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983) treated a decision of the District of Columbia Court of Appeals, as prescribed by 28 U.S.C. § 1257 as if it were the decision of a state court, and reaffirmed Rooker: "a United States District Court has no authority to review final judgments of a state court in judicial proceedings." Id. at 482. The Court noted that Feldman's allegations in the federal district court were "inextricably intertwined with the District of Columbia Court of Appeals' decisions, in judicial proceedings, to deny the respondents' petitions." Id. at 486-87.
 
 
 47
 Ahmed did not bring this case as an appeal from the judgment of a state court or ask the district court to review the proceedings of any state body, including the PAB, whose decisions were "inextricably intertwined" with his allegations. Ahmed asserted his claims under 42 U.S.C. § 1983. His federal claims preceded any state decision. We have held that application for a stay is the state's proper motion where state rulings are not inextricably intertwined with the federal case. Dubinka v. Judges of the Superior Court, 23 F.3d 218, 221 (9th Cir. 1994).
 
 
 48
 Federal jurisdiction attached on July 1, 1997 when Ahmed filed his federal complaint. The question we have to decide is whether federal jurisdiction was lost. Neither Rooker nor Feldman nor any case cited to us decides that question. If we do decide that jurisdiction was lost, we also have to decide when it was lost. We also need to create a new rule that will be neither Rooker nor Feldman but Ahmed.
 
 
 49
 The Original Jurisdiction Of The District Court . Jurisdiction existed under both the federal question statute, 28 U.S.C. § 1331 and under the more specific statute giving the district court "original jurisdiction" in any action to recover damages "under any Act of Congress providing for the protection of civil rights," 28 U.S.C. § 1343(a). Ahmed's complaint did not mention the latter statute, but, as the complaint asserted civil rights claims, § 1343(a) jurisdiction existed. Whitner v. Davis, 410 F.2d 24, 28, n.3 (9th Cir. 1969).
 
 
 50
 Ahmed's case in the federal court was against two individual defendants not named in the state proceeding as well as against the department that was a respondent in that proceeding. The relief sought in the federal case overlapped with the relief sought in the state case by including reinstatement but went beyond reinstatement to seek damages. As the PAB itself and the Thurston Superior Court decisions illustrate, Ahmed's constitutional claims, if any were made, could be ignored, and were ignored, by the first two state decisionmakers; the claims were not "inextricably intertwined" in the first two state proceedings.
 
 
 51
 Was Jurisdiction Lost and When? Four dates appear as possible candidates for the date that jurisdiction was lost. The first is December 19, 1997 when the PAB ruled against Ahmed. Any federal decision in his favor after that date would have ruled on a federal claim not adjudicated by the PAB. A federal decision also requiring his reinstatement would have been inconsistent with the result in the PAB. But on December 19, 1997, no one was aware that the PAB had ruled on any federal claim. The absence of federal jurisdiction was unknown to the district court and to the defendants and to this court when it ruled on the defendants' first appeal. A subterranean holding is being argued to deprive years of federal proceedings of any validity.
 
 
 52
 The second possible date is May 5, 1999 when the Thurston County Superior Court affirmed the PAB. This decision, known to the defendants, was not brought to our attention when we heard their first appeal, which we decided without any sense that we had been deprived of jurisdiction to hear it.
 
 
 53
 The decision of the Washington Court of Appeals on August 18, 2000 provides a third possible date, the more attractive because for the first time a federal claim was mentioned by a state decisionmaker. That decision came after Ahmed had secured his second federal jury verdict and judgment. To choose this date raises the question of how a state judgment can retroactively deprive a federal court of jurisdiction. The fourth possible date, January 9, 2001, when the Supreme Court of Washington denied Ahmed's petition for review, presents the same question of retroactivity, now to be considered.
 
 
 54
 No rule requires federal jurisdiction to vanish retroactively. For a period of three years two federal courts acted on Ahmed's case. No one suggests that all of the motions ruled on were ruled on by judges without jurisdiction. The only judgment that is retroactively argued to be without force because entered without jurisdiction is the judgment for Ahmed of June 30, 2000. It is a strange anomaly that a single act of judgment can now be isolated and declared ineffective because of something done in a state court after the federal judgment was entered.
 
 
 55
 Jurisdiction that exists but vanishes is an odd, although not an entirely unknown concept. Mootness will end jurisdiction. It ends it by terminating the controversy. Here the controversy continues. In a diversity case, once jurisdiction attaches, it persists. A party does not destroy it by changing residence to eliminate diversity. See Louisville, N.A. and C. Ry. Co. v. Louisville Vanking Co., 179 U.S. 552, 566 (1899). The principle was acknowledged by Chief Justice Marshall after an argument in which counsel conceded, "The general rule is, that a court, once having jurisdiction of a case, will keep it." See Morgan's Heirs v. Morgan, 15 U.S. (2 Wheat.) 290, 294-95 (1817).
 
 
 56
 As no precedent compels us to create retroactive destruction of jurisdiction here, and the general rule against such destruction counsels against it, why should we penalize a plaintiff who very naturally began the appeal process held out to him as an administrative review? Are we to say that if a state employee seeks a state administrative body and could have made a federal argument, he has lost any chance he might have had to sue under section 1983? Are we to encourage immediate resort to the federal courts, skipping any possible state remedy? The implications for practice of such a new rule make it a poor one to promulgate.
 
 
 57
 Another reason for creating a new rule might be what is loosely called "the new federalism" -- a preference for state law and state courts over federal law and federal courts. It has been speculated that the new federalism is at least in part responsible for the recent plethora of cases applying Rooker-Feldman. See Susan Bandes, "The Rooker-Feldman Doctrine: Evaluating Its Jurisdictional Status," 74 Notre Dame L. Rev., 1175, 1183 (1999). Such an explanation is plausible given that there have been over 500 cases in the last eleven years invoking Rooker and Feldman. See Suzanna Sherry, "Judicial Federalism In The Trenches," 74 Notre Dame L. Rev., 1085, 1088 (1999).
 
 
 58
 It is observable that application of these cases to oust a federal court of jurisdiction is a harsh rule. See Bandes, 74 Notre Dame L. Rev. at 1177. It is a rule not favorable to plaintiffs in civil rights cases. Id at 1177, 1205-07. It is a rule whose relation to § 1343 jurisdiction has been seriously questioned. See Jack M. Beermann, "Comments on Rooker-Feldman Or Let State Law Be Our Guide," 74 Notre Dame L. Rev., 1209, 1230 (1999). It is a rule that facilitates "house-cleaning" by federal district courts. Bandes at 1205-06. It is a rule that permits the invocation of "jurisdictional helplessness" -- "What Could I do? The doctrine is mandatory." See id. at 1207. There is little in the effects of the present rule to recommend that a new and powerful addition be made to the original formulation. There is much in these effects, in the rule's own rationale, and in the facts of this case to refuse retroactive application of Rooker-Feldman