### HAWAII STEVEDORES, INC. Plaintiff,

v.

### HT & T COMPANY, a division of Brewer Environmental Industries, LLC, et al. Defendant.

### No. CIV.04–00572 ACK–LEK.

United States District Court, D. Hawai'i.

Jan. 20, 2005.

Order denying reconsideration Feb. 24, 2005.

---

Robert P. Richards, Michele–Lynn E. Luke, Richards & Luke, Honolulu, HI, for Hawaii Stevedores, Inc., plaintiff.

Gary G. Grimmer, Melissa Hall Lambert, Carlsmith Ball, Honolulu, HI, for HT & T Company, a division of Brewer Environmental Industries, LLC, a Hawaii Limited Liability Company, John Does 1–10, Jane Does 1–10, Doe Corporations 1–10, Doe Partnerships 1–10, Doe Governmental Entities 1–10, Doe Non–Profit Entities 1–10, defendants.

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DECLINING JURISDICTION UNDER THE DECLARATORY JUDGMENT ACT

KAY, District Judge.

### FACTUAL BACKGROUND

This lawsuit arises from the provision of employees by Defendant HT & T Compa-

ny ("HT & T") to Plaintiff Hawaii Stevedores, Inc. ("HSI") at the Port of Hilo, on the Island of Hawaii. Both HSI and HT & T are stevedore companies operating in Hawaii. *See* Ex. 4 to Def.'s Concise Statement of Facts, filed 10/15/04 ("Def.'s CSF") at 1, Plt.'s Concise Statement of Facts, filed 12/23/04 ("Plt.'s CSF") at ¶ 2. Prior to 2002, HSI operated at the ports of Barbers Point, Pearl Harbor, Lahaina and Kawaihae. *See* Plt.'s CSF ¶ 22. HT & T provides stevedore services at the ports of Hilo and Kawaihae. *See* Ex. B to Plt.'s CSF at 12: 19–21.

HT & T and HSI are members of the Stevedore Industry Committee of Hawaii ("SIC"). *See* Ex. 4 to Plt.'s CSF at 2. The SIC, on behalf of its members (individually "employer", collectively "employers"), periodically engages in collective bargaining with longshore labor, which is represented by the ILWU Local 142 ("ILWU" or "Labor"). *See* Plt.'s CSF at ¶ 3. The negotiations between the SIC and ILWU result in Memoranda of Agreement ("MOA"), which serve as the basis for Collective Bargaining Agreements ("CBA" or "CBAs"). *See id.* at ¶ 4. Each employer (SIC member) executes a separate CBA with ILWU. *See id.* The provisions of each employer's CBA are similar though additional documents specific to an employer may be appended to the CBA. *See id.* at ¶ 5.

HT & T and ILWU are parties to CBAs for the period covering July 1, 1999 through June 30, 2002 and for the period covering July 1, 2002 through June 30, 2008 (collectively, the "HT & T CBAs"). *See* Exs. 18 and 20 to Def.'s CSF. Similarly, HSI and ILWU are parties to CBAs for the period covering July 1, 1999 through

June 30, 2002 and for the period covering July 1, 2002 through June 30, 2008 (collectively, the "HSI CBAs"). *See* Exs. 20 and 22 to Def.'s CSF. The July 1, 1999 through June 30, 2002 CBAs are based on an MOA between the SIC and ILWU dated October 25, 1999. *See* Ex. 17 to Def.'s CSF. The CBAs for the period covering July 1, 2002 through June 30, 2008 are based on a MOA between SIC[1] and ILWU dated January 4, 2003. *See* Ex. 19 to Def.'s CSF.

HSI contends that the HT & T CBAs and the HSI CBAs (collectively the "HSI/HT & T CBAs") obligate HT & T and HSI to engage in what the stevedore industry refers to as "labor loan." Labor loan is a practice where an employer loans its idle labor to fulfill the labor needs of a requesting employer.[2] *See* Def.'s CSF at ¶ 4, Ex. 16 and 23 to Def.'s CSF, Ex. B to Plt.'s CSF at 11: 21–25, 12: 1–18. Specifically, Section 2.07 of the HSI/HT & T CBAs provides:

> The Employer shall undertake to secure longshore work for employees covered by this agreement from shipping companies and agents operating vessels or barges in the port or ports in Hawaii where the Employer provides stevedoring services.

Exs. 18, 20, 21, and 22 to Def.'s CSF at § 2.07. Furthermore, Section 4.07 of the HSI/HT & T CBAs provides:

> Employees covered by this Agreement and who are assigned to gangs or who are skilled (including subs and alternates), shall be entitled to a fair and equal distribution of available work opportunity by assigning individuals or gangs with the lowest work opportunity hours within their respective classifica-

---

1. Both MOAs are signed by representatives of HSI, HT & T, Matson Terminals, Inc. and McCabe, Hamilton & Renny Co., Ltd. *See* Exs. 17 and 19 to Def.'s CSF.

2. Employers benefit from labor loan because the practice allows each employer to maintain

a smaller work force. *See* Plt.'s Opp. at 2–3, Ex. 4 to Def.'s CSF at 3. The practice benefits employees in that labor loan hours contribute to an employee's work opportunity, income, and fringe benefits. *See* Plt.'s CSF at ¶ 13.

tions. Equal distribution of work opportunity shall be made on a gang basis. No gang or individuals shall be entitled to their equal share of the work if they fail to make themselves available for work opportunity. **The present practice of exchanging gangs between employers shall be continued.**

Exs. 18, 20, 21, and 22 to Def.'s CSF at § 4.07 (emphasis added).

On or about May 1, 1987, HT & T and HSI, among other employers, executed an Agreement on Allocation of Employer Costs of Providing Fringe Benefits ("Fringe Benefit Agreement")[3] to carry out the requirements set forth in each of the employer's CBA requiring payment of fringe benefits to employees. *See* Ex. 24 to Def.'s CSF; *see also* Plt.'s CSF at ¶ 15. The Fringe Benefit Agreement provides a formula and procedures to fairly allocate costs between employers who engage in labor loan. *See* Ex. 24 to Def.'s CSF, Plt.'s CSF ¶ 16.

Although there is no explicit written agreement signed by all SIC members (similar to the Fringe Benefit Agreement) regarding the rate or price that the lending employer may charge the borrowing employer for the labor provided, *see* Def.'s CSF ¶ 2; the SIC periodically publishes labor loan rates which the lending employer ordinarily applies in its invoices to the borrowing employer. *See* Ex. B to Plt.'s CSF at 16: 16–25, 69: 25, 70: 1–2, Ex. 25 to Def.'s CSF. According to HSI, the labor loan practice necessarily includes the use of the uniform SIC-determined labor loan rate. *See* Opp. at 12.

In January of 2002, HSI agreed to provide stevedoring services at the Port of Hilo to its existing Honolulu customer Norwegian Cruise Lines ("NCL") to begin in mid-January 2002. *See* Plt.'s CSF ¶ 21. Because HSI did not employ longshoremen at the Port of Hilo at that time and because the HSI/HT & T CBAs[4] required HSI to borrow idle labor from a local employer, i.e. HT & T,[5] HSI requested and HT & T agreed to provide stevedores to HSI for service of NCL's vessels at the Port of Hilo. *See* Plt.'s CSF ¶ 25, Def.'s Opp. at 3 (citing Ex. 4 to Def.'s CSF).

Shortly thereafter, a dispute regarding the applicable rate/price for the labor provided by HT & T arose. HT & T took the position that the usual rate for passenger cruise lines applied because, among other things, (1) it informed HSI from the outset that it would lend its stevedores at that rate and (2) labor loan did not apply because HSI was not based in Hilo. *See* Plt.'s Opp. at 3–4 (citing Ex. 4 to Plt.'s CSF), Ex. 16 to Def.'s CSF. HSI, on the other hand, contended that the labor loan rate established by the SIC applied. *See* Ex. 16 to Def.'s CSF. HSI remitted payment to HT & T based on the SIC-determined labor loan rate despite being invoiced by HT & T at the higher rate. *See id.*

On or about April 17, 2002, HT & T filed a lawsuit against HSI in the Third Circuit Court, State of Hawaii, styled *HT & T Co. v. Hawaii Stevedores, Inc.,* Civ. No. 02–1–0148(GKN) ("First State Court Case"), to recover amounts allegedly owed by HSI for HT & T's provision of labor at the Port of Hilo.[6] *See* Ex. 1 to Def.'s CSF. In the

3. The Fringe Benefit Agreement supersedes an earlier agreement originally executed in 1974 by various employers designated as FMC Agreement T–2879. *See* Plt.'s CSF ¶ 16.

4. The ILWU advised that HSI was required to use idle local labor (HT & T employees) to service NCL's vessels at the Port of Hilo. *See* Ex. A to Plt.'s CSF at 56: 11–25, 57: 1–10.

5. From at least January of 2002 to December of 2003, HT & T was the only employer that had a labor unit in Hilo. *See* Compl. ¶ 59, Ex. 4 to Def.'s CSF

6. HSI filed a Notice of Removal on November 15, 2002. *See* Ex. 1 to Def.'s CSF at 2. However, the case was subsequently remanded to state court on grounds that removal was

First State Court Case, Judge Nakamura concluded that (1) there was no express agreement between HSI and HT & T that the labor loan rate applied to HSI's use of HT & T's labor in Hilo, (2) there was no admissible evidence that the SIC agreed that the labor loan rate applied in a situation where the entity requesting labor did not have a physical facility and resident employees in the port at which the labor was to be provided, and (3) the parties did not have a meeting of the minds regarding the price term for which HT & T would supply labor to HSI. *See* Ex. 2 to Def.'s CSF. Judge Nakamura also held that even if the labor loan rate would have ordinarily applied, because HT & T stated its intent not to use the labor loan rate prior to providing labor, usage did not supplement the agreement. *See id.* After conducting a bench trial limited to the issue of price, Judge Nakamura devised a template[7] for calculating the applicable rate. *See* Ex. 4 to Def.'s CSF. Utilizing the template rate, on or about September 9, 2004, the jury awarded HT & T a total of $171,082.46 for amounts owed by HSI through early December 2003. *See* Ex. 7 and 27 to Def.'s CSF, Plt.'s Opp. at 5. Final judgment entered on December 7, 2004 in favor of HT & T on Counts One and Two of the Second Amended Complaint[8] and against HSI on Counts 1 through 5 of HSI's Counter-

claim,[9] from which HSI has appealed. *See* Ex. F to Plt.'s CSF.

Notwithstanding this dispute, HT & T has continued to lend its idle Hilo labor pursuant to HSI's request. *See* Compl. ¶ 62, 63, Ex. 26 to Def.'s CSF. As of approximately August 1, 2004, with the approval of ILWU, HSI has placed two of its own stevedores at the Port of Hilo.[10] *See* Plt.'s Opp. at 5, Ex. E to Plt.'s CSF, Ex. 27 to Def.'s CSF. HSI contends that this new development negates HT & T's previous argument that the traditional labor loan practice did not apply, and hence, that HT & T is certainly now entitled to no more than payment at the labor loan rate published by the SIC. *See* Ex. 26 to Def.'s CSF. HT & T takes the position that the template rate established in the First State Court Case is controlling. *See* Ex. 27 to Def.'s CSF.

On September 22, 2004, HSI filed the Complaint in this action seeking the following declarations: (1) "HT & T COMPANY is in violation of its contractual obligations, as set forth in the 1999 CBA, the 2002 CBA and FMC Agreement T-2879, by failing to honor labor loan rates for HAWAII STEVEDORES, INC.'s use of HT & T COMPANY's idle labor in the Port of Hilo[,]" (2) "HAWAII STEVEDORES, INC. is not obligated to pay HT

---

untimely, and alternatively, that Plaintiff's state law claims did not trigger federal subject matter jurisdiction. *See id.; see also* Def.'s Opp. at 4.

**7.** The template incorporates items such as payroll taxes, industry fringe benefits, company fringe benefits, department overhead, administrative overhead and profit. *See* Ex. 4 to Def.'s CSF at 7; *see also* Def.'s Mot. at 5, n. 2.

**8.** Count One of the Second Amended Complaint dated November 4, 2003 stated a claim for underpayment. Count Two was for violation of Hawaii Revised Statutes ("HRS") § 480–2 (unfair competition). *See* Ex. 9 to Grimmer Decl., filed 1/12/05.

**9.** HSI asserted the following claims in its Amended Counterclaim filed on June 13, 2002 in the First State Court Case: Count I (frivolous lawsuit/abuse of process), Count II (breach of contract), Count III (restraint of trade), Count IV (intentional interference with business prospects), Count V (punitive damages). *See* Ex. 11 to Grimmer Decl., filed 1/12/05.

**10.** According to HT & T, two stevedores alone cannot service a cruise ship or fulfill the requirements of the HSI CBAs for any job. *See* Ex. 27 to Def.'s CSF.

& T COMPANY at HT & T COMPANY's commercial/customer rate for any idle labor borrowed by HAWAII STEVEDORES, INC. on or after August 1, 2004[,]" and (3) "Labor Loan rates, as established and periodically amended by the SIC, shall apply, prospectively, to the use of idle labor by HAWAII STEVEDORES, INC. for work in Hilo." Compl. at 19.

On October 15, 2004, HT & T filed the instant Motion for Summary Judgment pursuant to Federal Rules of Civil Procedure ("FRCP") 56 and 12(b)(6) (the "Motion").[11] HT & T argues that the Motion should be granted because (1) the Court lacks subject matter jurisdiction, (2) res judicata bars this lawsuit and (3) the merits warrant summary judgment in its favor. HSI submitted an opposition to the Motion on December 23, 2004. HSI counters that the Court has subject matter jurisdiction under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a) ("Section 301") and that res judicata does not apply because the First State Court Case has not been adjudicated with finality. HT & T replied on December 30, 2004.

The Court heard oral argument on the Motion on January 10, 2005. At the hearing, counsel for HT & T represented that HT & T had filed another action in the Third Circuit Court, State of Hawaii,[12] for collection of amounts due from HSI for the periods not covered by the First State Court Case ("Second State Court Case"). Counsel for HSI did not object to this representation. On January 11, 2005, HSI filed the Declaration of Michelle–Lynn E. Luke (counsel for HSI), attaching as Exhibit "G" the original Complaint in the First State Court Action. On January 12, 2005, HT & T filed the Declaration of Gary G. Grimmer (counsel for HT & T) attaching as Exhibits "1" through "13" various documents filed in the First and Second State Court Cases.

## STANDARD OF REVIEW

### I. DISMISSAL FOR LACK OF SUBJECT MATTER JURISDICTION

█ "A party invoking the federal court's jurisdiction has the burden of proving the actual existence of subject matter jurisdiction." *See Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir.1996). On a Rule 12(b)(1) motion, the court is not "restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir.1988). "Once the moving party [converts] the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1040 n. 2 (9th Cir.2003).

"The requirement that the nonmoving party present evidence outside his pleadings in opposition to a motion to dismiss for lack of subject matter jurisdiction is the same as that required under Rule 56(e) that the nonmoving party to a motion for summary judgment must set forth specific facts, beyond his pleadings, to show that a genuine issue of material fact exists." *Trentacosta v. Frontier Pac. Aircraft In-*

---

11. HT & T filed an Errata Sheet Regarding Pages 5, 17, 18 and 19 of the Motion and an Amended Errata Sheet Regarding Pages 5, 17, 18 and 19 of the Motion on October 29, 2004 and November 3, 2004, respectively.

12. The Complaint, filed on October 8, 2004, is styled *HT & T Co. v. Hawaii Stevedores, Inc.*, Civ. No. 04–1–336. *See* Ex. 1 to Grimmer Decl., filed 1/12/05.

dus., Inc., 813 F.2d 1553, 1559 (9th Cir. 1987). Thus, the moving party "should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Casumpang v. Int'l Longshoremen's & Warehousemen's Union*, 269 F.3d 1042, 1060–61 (9th Cir.2001).

## II. SUMMARY JUDGMENT

■ Summary judgment shall be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Rule 56(e) requires that the nonmoving party set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). At least some "significant probative evidence tending to support the complaint" must be produced. *Id.* Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *See British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978). However, if the moving party fails to carry its initial burden of production, the nonmoving party may defeat the motion for summary judgment without producing anything. *See Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir.2000).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289 (9th Cir.1987) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505.

■ "[I]f the factual context makes the nonmoving party's claim *implausible*, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Franciscan Ceramics*, 818 F.2d at 1468 (emphasis in original). All evidence and inferences to be drawn therefrom must be construed in the light most favorable to the nonmoving party. *See T.W. Elec. Serv.*, 809 F.2d at 630–31.

## DISCUSSION

## I. SUBJECT MATTER JURISDICTION

■ HT & T contends that the Court lacks subject matter jurisdiction because the disputed issue, i.e. the applicable rate for labor provided to HSI at the Port of Hilo, is one of state contract law. *See* Def.'s Mot. at 8. According to HT & T, the dispute does not arise under the CBAs or the Fringe Benefit Agreement or involve a union or stevedore industry issue. *See id.* at 8–13. HSI, on the other hand, argues that the Court has jurisdiction under Section 301(a) of the Labor Management Relations Act ("LMRA") ("Section 301") because the dispute cannot be resolved without reference to and interpretation of the CBA and labor interests are significantly affected by the labor loan practice. *See* Plt.'s Opp. at 7. HSI also contends that the labor loan practice is a part of the CBAs. *See* Plt.'s Opp. at 10. HT & T, however, argues that HSI lacks standing to sue for breach of the HT & T CBAs. *See* Reply at 9–10.

■ Section 301 provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any dis-

trict court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C.A. § 185(a). The purpose of Section 301 is "to promote industrial peace and responsibility by permitting agreements between labor organizations and employers to be enforced in federal court" and to facilitate "the development of a body of labor law that gives consistent and uniform interpretations of labor contract terms." *Painting & Decorating Contractors Ass'n v. Painters & Decorators Joint Comm.*, 717 F.2d 1293, 1295 (9th Cir.1983) (denying petition for rehearing of *Painters*). The Ninth Circuit counsels that "Section 301 is not to be given a narrow reading." *Garvey v. Roberts*, 203 F.3d 580, 587 (9th Cir.2000) (citation omitted).

■ Section 301 "governs claims founded directly on rights created by collective bargaining agreements, and also claims substantially dependent on analysis of a collective bargaining agreement." *Contract Svcs. Network, Inc. v. Aubry*, 62 F.3d 294, 299 (9th Cir.1995). In the Ninth Circuit, "[a]ll that is required for jurisdiction to be proper under § 301(a)" is that (1) the suit be based on an alleged breach of contract between an employer and a labor organization ("first requirement") and (2) that the resolution of the lawsuit be focused upon and governed by the terms of the contract ("second requirement"). *Painting & Decorating Contractors Ass'n v. Painters & Decorators Joint Comm.*, 707 F.2d 1067, 1071 (9th Cir.1983) ("*Painters*"); *see also Garvey*, 203 F.3d at 587. Both requirements are met if the right allegedly breached arises from the CBA. *See Garvey*, 203 F.3d at 588.

■ Though common, the "contract" allegedly violated need not necessarily be a collective bargaining agreement. *See id.* at 1072, n. 4. The contract can "extend to documents beyond the collective bargaining agreement itself, as separate documents are often used to define the rights and obligations contemplated in a single contract." *Garvey*, 203 F.3d at 587. Furthermore, the analysis is not dependent upon the parties to the suit, but rather on the nature or subject matter of the action. *See Painters*, 707 F.2d at 1071. Thus, jurisdiction can exist "even if neither party is a union or an employer." *Rehmar v. Smith*, 555 F.2d 1362, 1366 (9th Cir.1976).

HSI has sufficiently shown for purposes of this Motion that this lawsuit is based on an alleged breach of contract between an employer and a labor organization. The CBAs constitute contracts between an employer and a labor organization. The HT & T CBAs provide that HT & T must "undertake to secure longshore work for employees covered by this agreement from shipping companies and agents operating vessels or barges in the port or ports in Hawaii where the Employer provides stevedoring services," exs. 18, 20, 21 and 22 to Def.'s CSF at § 2.07, and must continue "[t]he practice of exchanging gangs between employers." Exs. 18, 20, 21 and 22 to Def.'s CSF at § 4.07. HSI contends that the terms of the HT & T CBAs, for example the requirement that "the practice of exchanging gangs between employers shall be continued," must be interpreted in consideration of the industry practice of labor loan which mandates application of the SIC-determined labor loan rate. *See* Plt.'s Opp. at 10; *see also* Ex. B to Plt.'s CSF at 16: 11–25. According to HSI, HT & T is in breach of the HT & T CBAs because it refuses to accept payment at the rate determined by the SIC. *See* Compl. ¶ 80 ("HT & T COMPANY is contractually obligated to Labor Loan to HAWAII STEVEDORES,INC., for work in Hilo, at labor loan rates, but has refused to do so."). That the dispute is between two employers, rather than between an employer and labor, does not in itself defeat jurisdiction

under Section 301. *See Painters,* 707 F.2d at 1071. Thus, the first requirement is satisfied.

 The second requirement—that resolution of the lawsuit be focused upon and governed by the terms of the contract—is fulfilled where the rights and liabilities of the parties are determined by the collective bargaining agreement. *See Carpenters S. Cal. Admin. Corp. v. Majestic Housing,* 743 F.2d 1341, 1345 (9th Cir. 1984) (second requirement not met where party has no rights or liabilities under the agreement). The critical issue is whether HSI's alleged right to borrow labor at the SIC-determined labor loan rate arises from (or under) the HT & T CBAs. *See Garvey,* 203 F.3d at 588 (claim properly brought under Section 301 where right "arises from" the CBA); *see also Contract Svcs. Network, Inc.,* 62 F.3d at 299 (Section 301 "governs claims founded directly on rights created by collective bargaining agreements").

 Based on the evidence presented, the Court cannot conclude as a matter of law that HSI's alleged right does not arise from the HT & T CBAs. At the hearing, counsel for the parties disputed whether HSI had standing as a third-party beneficiary to assert a claim for breach of the HT & T CBAs. The determination of third-party beneficiary status is determined by state law to the extent it is compatible with federal labor policy. *See Sepulveda v. Pac. Maritime Assoc.,* 878 F.2d 1137, 1139 (9th Cir.1989). Under Hawaii law, a third-party beneficiary is "one for whose benefit a promise is made in a contract but who is not a party to the contract." *Pancakes of Hawaii, Inc. v. Pomare Properties Corp.,* 85 Hawai'i 300, 944 P.2d 97, 106 (1997). The parties to the contract must have intended to benefit the third-party, who must be something more than an incidental beneficiary. *See id.* In determining intent, "the court may look to evidence outside the four corners of the document, such as the circumstances of negotiations of the parties in making the contract." *Sepulveda,* 878 F.2d at 1139 (citing *Garcia v. Truck Ins. Exchange,* 36 Cal.3d 426, 437, 204 Cal.Rptr. 435, 682 P.2d 1100 (1984)).

The evidence presented in connection with the Motion supports that HSI may be an intended third-party beneficiary[13] of the HT & T CBAs. Section 4.07 of the HT & T CBAs provide that "the present practice of exchanging gangs between employers shall be continued." HSI is likely an "employer" as that term is used in Section 4.07 of the HT & T CBAs. *See Ex. 23 to Def.'s CSF; see also Sepulveda,* 878 F.2d at 1139 ("Although the beneficiary need not be named in the contract, he must be a member of a class referred to and identified in it."). HSI presented evidence that the labor loan practice benefits both the lending and borrowing employers by allowing the lending employer to maintain a smaller workforce and the borrowing employer to fulfill wage guaranty obligations. *See Ex. A to Plt.'s CSF at 103: 4–25, 104:*

---

**13.** Although employees typically assert third-party beneficiary status under collective bargaining agreements, *see e.g., Sepulveda,* 878 F.2d at 1139, HT & T has not cited, nor is the Court familiar with, authority that an employer cannot, as a matter of law, hold third-party beneficiary status with respect to a collective bargaining agreement between another employer and labor. The Court notes that pension and welfare funds established pursuant to collective bargaining agreements are afforded third-party beneficiary status such that the trustees of such funds may bring a Section 301 claim against employers for failure to make employee contributions required by the collective bargaining agreement. *See Sinai Hospital v. Nat'l Benefit Fund For Hospital & Health Care Employees,* 697 F.2d 562, 568 (4th Cir.1982), *Laborers' Pension Fund v. Joe Cachey Construction Co., Inc.,* 947 F.Supp. 365, 368 (N.D.Ill.1996).

1–24. The evidence also shows that the labor loan practice benefits Labor by increasing their work opportunity, income and fringe benefits. *See* Plt.'s CSF at ¶ 13. Therefore, it is plausible that the parties to the HT & T CBAs (HT & T and ILWU) intended to confer a benefit on other "employers" such as HSI through their agreement that the labor loan practice shall continue.

That the CBAs are based on MOAs negotiated by the SIC (on behalf of all employers) with the ILWU also supports that employers such as HSI may be intended third-party beneficiaries of the various CBAs. The terms of FMC Agreement No. T–2879, predecessor to the Fringe Benefit Agreement, suggests that as early as 1973 the employers perceived a need for cooperation between themselves to facilitate their CBA-based labor loan obligation:

WHEREAS, said collective bargaining agreements were adopted in part for the purpose of accomplishing, to the extent practicable, equalization of work opportunity among the longshore and wharf clerk employees of the Employers, the balancing of the workforce against work opportunity, both in terms of total number and distribution of employees, and the dispatch of vessels and performance of other related work in the most efficient and economical manner consistent with good stevedoring practices; and

WHEREAS, in order to carry out the requirements of said collective bargaining agreements it has become necessary for a given Employer from time to time to use employees of other Employers, sometimes in addition to that Employ-

er's own workforce and sometimes in lieu of that Employer's own workforce; and

WHEREAS, the use by a given Employer of the workforce of other Employers has resulted and will continue to result in a distortion of the true costs to the Employers concerned of employee fringe benefit programs listed in Schedule A attached hereto and the annual pension cost of the Employers as hereinafter described:

NOW, THEREFORE, in order to eliminate any such distortion of true costs among the respective Employers which has not been adjusted through other approved agreements or which may occur during the period of the current collective bargaining agreement; and in order to provide a formula and procedures to accomplish that objective; and in consideration of their mutual covenants and undertakings, the Employers, being the signatories hereto, hereby agree as follows . . . .

Ex. 23 to Def.'s CSF. Cooperation among the employers, as evidenced by FMC Agreement No. T–2879 and the Fringe Benefit Agreement, supports that employers, collectively as a group, may be intended third-party beneficiaries of the various CBA.

In summary, a disputed material issue of fact regarding whether HSI has an enforceable right under the HT & T CBAs to borrow labor at the SIC-determined labor loan rate from HT & T at the Port of Hilo[14] exists. Accordingly, summary judgment is not appropriate on grounds that the Court lacks subject matter jurisdiction.[15] *See Casumpang,* 269 F.3d at

**14.** Section 4.07 of the HT & T CBAs and Attachment 16 to the MOA, entitled "Understanding Re: Hilo Assignments and Labor Loan" signed by HT & T and dated September 24, 1999, contradicts HT & T's contention that it has no obligation to engage in the

practice of labor loan with respect to the Port of Hilo.

**15.** In its Reply, HT & T conceded that res judicata does not apply because HSI's appeal of the judgment entered in the First State Court case is currently pending before the

1060–61 (moving party "should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law").

## II. DECLARATORY JUDGMENT ACT JURISDICTION

■ HSI seeks declarations pursuant to 28 U.S.C. § 2201, 2202, i.e. the Declaratory Judgment Act ("DJA"). *See* Compl. ¶¶ 4, 82–90. The DJA provides in relevant part:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a) (emphasis added). Because the DJA is "deliberately cast in terms of permissive, rather than mandatory, authority[,]" even "[i]f the suit passes constitutional and statutory muster, the district court must also be satisfied that entertaining the action is appropriate." *See Gov't Employees Ins. Co. v. Dizol,* 133 F.3d 1220, 1222–23 (9th Cir.1998) (en banc) (lawsuit seeking federal declaratory relief must fulfill statutory jurisdictional prerequisites). The parties have not addressed whether it is appropriate for the Court to exercise jurisdiction under the DJA. The Court finds that the evidence and arguments presented in connection with the Motion warrant discussion of this issue sua sponte. *See id.* at 1224 n. 4.

■ In deciding whether exercise of DJA jurisdiction is proper, the Court's analysis should focus on the following factors, taken from *Brillhart v. Excess Ins. Co. of America,* 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942): 1) avoiding needless determination of state law issues, 2) discouraging litigants from filing declaratory actions as a means of forum shopping, and 3) avoiding duplicative litigation. *See Dizol,* 133 F.3d at 1225. "Essentially, the district court 'must balance concerns of judicial administration, comity, and fairness to the litigants.'" *Robinson* (citing *Am. States Ins. Co. v. Kearns,* 15 F.3d 142, 144 (9th Cir.1994)). Additional relevant considerations include:

> whether the declaratory action will settle all aspects of the controversy; whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue; whether the declaratory action is being sought merely for the purposes of procedural fencing or to obtain a 'res judicata' advantage; or whether the use of a declaratory action will result in entanglement between the federal and state court systems. In addition, the district court might also consider the convenience to the parties, and the availability and relative convenience of other remedies.

*Id.* (citing *Dizol,* 133 F.3d at 1225, n. 5). Where "the district court should decline to exercise its jurisdiction, it must 'explain the basis for its decision on the record.'" *Principal Life Ins. Co. v. Robinson,* No. 03–35376 (9th Cir. Jan. 6.2005) (citing *Dizol,* 133 F.3d at 1221).

---

Hawaii Supreme Court. *See* Def.'s Reply at 14 (citing this Court's decision in *Pedrina v. Chun,* 906 F.Supp. 1377, 1402 (D.Haw.1995), for the proposition that a Hawaii state court judgment is not final for res judicata purposes if appeal has been taken). Because the Court

concludes that it is not appropriate to exercise jurisdiction under the Declaratory Judgment Act, as discussed in detail below, the Court will not address HT & T's argument that summary judgment should be granted on the merits.

 The Court finds that it is not appropriate to exercise jurisdiction under the circumstances of this case.[16] First, the parties have already litigated and continue to litigate closely related, if not identical, factual and legal issues in the First and Second State Court Cases. Although "[t]he pendency of a state court action does not, of itself, require a district court to refuse federal declaratory relief[,] ... **federal courts should generally decline to entertain reactive declaratory actions.**" *Dizol,* 133 F.3d at 1225 (emphasis added).

The presumption is especially applicable here because the appeal pending in the First State Court case raises comity and entanglement concerns. There are at least two issues on appeal that could potentially conflict with the outcome of this case. For example, this Court could conclude (as HT & T urges) that the SIC-determined labor loan rate does not apply while the state appellate court could determine (as HSI insists) that Judge Nakamura should have applied the SIC-determined labor loan rate. Alternatively, the state appellate court could affirm Judge Nakamura's finding that even if the labor loan rate would have ordinarily applied, HT & T was not bound by that rate because it previously stated its intent not to use the labor loan rate while this Court could conclude that the SIC-determined labor loan rate applies because the HT & T CBAs require it. In either example, the potential for entanglement between the federal and state court systems is evident.

Moreover, wise judicial administration also counsels in favor of declining jurisdiction. While the Court notes that HSI alleges that the presence of two of its stevedores at the Port of Hilo as of August 2004 presents a changed circumstance, the Court's adjudication of this case will nevertheless require it to duplicate, to a large extent, the efforts of Judge Nakamura in the First State Court Case. Furthermore, the Second State Court Case, which includes periods after August 2004[17] and presents the same factual circumstances of this case, is currently pending before Judge Nakamura.[18] *See* Ex. 1 to Grimmer Decl. at ¶ 10–11. Judge Nakamura is considerably more familiar with the parties and the issues as a result of the extensive proceedings in the First State Court Case.

 Finally, the state court has jurisdiction to adjudicate the claims asserted by HSI here. It is well-settled that the state and federal courts have concurrent jurisdiction over Section 301 claims. *See Local 174 v. Lucas Flour Co.,* 369 U.S. 95, 101, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); *see also Krey,* 572 F.2d at 1283 (citing *Charles*

16. That jurisdiction may be proper under the LMRA does not override the Court's discretion to decline DJA jurisdiction. *See Krey Packing Co. v. Hamilton,* 572 F.2d 1280, 1284 (8th Cir.1978) (affirming district court's exercise of discretion to refuse declaratory relief in case alleging jurisdiction under Section 301 and the Federal Arbitration Act).

17. This action will not settle all aspects of the dispute as it involves the time period after August 2004. The parties also dispute the rate applicable for periods prior to August 2004.

18. The Court acknowledges that Judge Nakamura issued a stay in the Second State Court Case, presumably pending the outcome of the appeal in the First State Court Case and the outcome of this case. *See* Ex. 3–6 to Grimmer Decl., filed 1/12/05. In moving for stay of the Second State Court Case, HSI argued that appeal of Judge Nakamura's decisions in the First State Court Case will directly impact the issues raised in the Second State Court Case and that certain aspects of the relief sought by HT & T in the Second State Court case overlap with issues presented in this case. *See* Ex. 3 to Grimmer Decl. at 9–10. The overlap of issues HSI identified raises comity, entanglement and efficiency concerns that counsel against exercise of DJA jurisdiction.

*Dowd Box Co. v. Courtney*, 368 U.S. 502, 506–07, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962), for the proposition that "[S]ection 301(a) does not state or even suggest that such jurisdiction shall be exclusive. It provides that suits of the kind described 'may' be brought in the federal district courts, not that they must be."). "Suits and defenses based on contracts specified in s 301 may be heard in state court, though the applicable substantive law for the enforcement of agreements is federal labor law." *Krey*, 572 F.2d at 1283. Thus, the remedies HSI seeks in this case are available in state court.[19]

In summary, the balance of relevant factors weigh decidedly in favor of declining DJA jurisdiction.

### CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's Motion for Summary Judgment. The Court finds that the existence of a material fact issue regarding whether HSI is an intended third-party beneficiary of the HT & T CBAs, and hence whether HSI's alleged right to borrow labor from HT & T at the SIC-determined labor loan rate arises from the HT & T CBAs, precludes summary judgment for lack of subject matter jurisdiction.

The Court, however, in exercise of its discretion under the Declaratory Judgment Act, declines jurisdiction of this case. The relevant considerations, particularly (1) avoiding duplicative litigation, (2) preventing entanglement, (3) that the action will not settle all aspects of the controversy, (4) the availability of the same remedies in state court, (5) deterring forum shopping and (6) concerns regarding judicial administration and comity, counsel in

favor of declining jurisdiction under the DJA. *See Dizol*, 133 F.3d at 1225, n. 5.

IT IS SO ORDERED.

### ORDER DENYING PLAINTIFF HAWAII STEVEDORES, INC.'S MOTION TO RECONSIDER THE ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DECLINING JURISDICTION UNDER THE DECLARATORY JUDGMENT ACT, FILED JANUARY 20, 2005

### BACKGROUND

The facts of this dispute are discussed in detail in the Court's Order Denying Defendant's Motion for Summary Judgment and Declining Jurisdiction Under the Declaratory Judgment Act of January 20, 2005 (the "Order") and will not be repeated herein. There, the Court found that the existence of a material fact issue regarding whether Plaintiff Hawaii Stevedores, Inc. ("HSI") is an intended third-party beneficiary of Defendant HT & T Co.'s ("HT & T") collective bargaining agreements ("HT & T CBAs"), and hence whether HSI's alleged right to borrow labor from HT & T at the Stevedore Industry Committee of Hawaii ("SIC") -determined labor loan rate arises from the HT & T CBAs, precluded summary judgment for lack of subject matter jurisdiction. See Order at 20. The Court, however, in exercise of its discretion under the Declaratory Judgment Act ("DJA"), declined jurisdiction. The Court found that the relevant considerations, particularly (1) avoiding duplicative litigation, (2) preventing entanglement, (3) that the action will not settle all aspects of the controversy, (4) the availability of the same remedies in state court, (5) deterring

---

**19.** The Court notes that allowing an unsuccessful party to a state court proceeding to raise similar arguments that involve re-litigation of issues unfavorably decided in a subsequent action brought in federal court may facilitate forum shopping.

forum shopping, and (6) concerns regarding judicial administration and comity, counsel in favor of declining jurisdiction under the DJA. *See* Order at 25–26.

On January 28, 2005, HSI filed the instant Motion to Reconsider the Order (the "Motion").[1] HSI argues that the Court does not have discretion to decline jurisdiction and that assuming that such discretion exists, the criteria for declining jurisdiction has not been met. HSI also contends that because its claims "involve stevedore operations which are, by definition, maritime activities, the Court has exclusive jurisdiction over the claims asserted in HSI's Complaint." Plt.'s Mot. at 6.

On February 8, 2005, HT & T filed an Opposition to the Motion. HT & T contends that the Court properly declined jurisdiction under the DJA and that the Court does not have exclusive jurisdiction pursuant to 28 U.S.C. § 1333 (admiralty). According to HT & T, the "savings to suitors" clause allows HSI to bring its claims in state court.

In Reply, filed February 16, 2005, HSI argues that the Court may not abstain because HSI has invoked admiralty jurisdiction and the criteria for declining jurisdiction under the DJA have not been met.

The Motion came on for hearing before the Court on February 23, 2005.

### STANDARD OF REVIEW

In the Ninth Circuit a successful motion for reconsideration must accomplish two goals. First it must demonstrate some reason why the court should reconsider its prior decision. *Na Mamo O 'Aha 'Ino v. Galiher*, 60 F.Supp.2d 1058, 1059 (D.Hawai'i 1999) (citation omitted). Second, a motion for reconsideration must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision. *Id.* Courts have established three grounds justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice. *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1178–79 (9th Cir.1998); *Great Hawaiian Financial Corp. v. Aiu*, 116 F.R.D. 612, 616 (D.Haw.1987), *rev'd on other grounds*, 863 F.2d 617 (9th Cir.1988). The District of Hawaii has implemented these standards in Local Rule 60.1.[2]

Mere disagreement with a previous order is an insufficient basis for reconsideration. *See Leong v. Hilton Hotels Corp.*, 689 F.Supp. 1572 (D.Haw.1988). Furthermore, reconsideration may not be based on evidence and legal arguments that could have been presented at the time of the challenged decision. *See Kona Enter., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir.2000); *All Hawaii Tours,*

---

**1.** Plaintiff also lodged an Ex Parte Application for Oral Hearing on the Motion on January 28, 2005. HT & T filed the Declaration of Gary G. Grimmer in Opposition to the Ex Parte Application For Oral Hearing on the Motion on February 3, 2005. By Order dated February 11, 2005, the Court granted Plaintiff's Ex Parte Application for Oral Hearing on the Motion and set the Motion for hearing on February 24, 2005 at 11:00 a.m. The hearing was later rescheduled for February 23, 2005 at 2:00 p.m.

**2.** Local Rule 60.1 provides that:

Motions for reconsideration of interlocutory orders may be brought only upon the following grounds:
(a) Discovery of new material facts not previously available;
(b) Intervening change in law;
(c) Manifest error of law or fact.
Motions asserted under Subsection (c) of this rule must be filed not more than ten (10) business days after the court's written order is filed.
Local R. 60.1 (2003) (Motions for Reconsideration).

*Corp. v. Polynesian Cultural Ctr.*, 116 F.R.D. 645, 649–50 (D.Haw.1987), *rev'd on other grounds*, 855 F.2d 860 (9th Cir.1988). "Whether or not to grant reconsideration is committed to the sound discretion of the court." *Navajo Nation v. Confederated Tribes and Bands of the Yakama Indian Nation*, 331 F.3d 1041, 1046 (9th Cir.2003) (citing *Kona Enter., Inc.*, 229 F.3d at 883).

## DISCUSSION

### I. ADMIRALTY/MARITIME JURISDICTION

■ HSI argues that the Court has jurisdiction under Title 28, United States Code § 1333 ("Section 1333"), which provides in relevant part:

> The district courts shall have original jurisdiction, exclusive of the courts of the States, of:
>
> (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

28 U.S.C.A. § 1333. HSI contends that "this case concerns maritime activity within the State of Hawaii, and necessarily requires analysis of existing CBAs and FMC Agreement T–2879, such that admiralty/maritime jurisdiction has been triggered." Plt.'s Mot. at 8 (citing *Corna v. Am. Hawaii Cruises, Inc.*, 794 F.Supp. 1005, 1007 (D.Hawai'i 1992)). HT & T, however, argues that the Court does not have exclusive jurisdiction because this action is "neither a limitation of liability proceeding nor a maritime action in rem" and "[f]urthermore, it is not even clear that this case arises under admiralty law." Def.'s Opp. at 9–10.

HSI's current reliance on admiralty jurisdiction is belied by its failure to raise Section 1333 [3] as a basis for opposing HT & T's Motion for Summary Judgment for lack of subject matter jurisdiction. In its Opposition to HT & T's Motion for Summary Judgment, filed December 23, 2004, HSI argued that jurisdiction was sustainable under Section 301 of the Labor Management Relations Act, 29 U.S.C. §§ 141 et seq. HSI's Opposition was completely devoid of any reference to admiralty jurisdiction or Section 1333. Furthermore, HSI's jury demand, filed with the Complaint contradicts its purported reliance on admiralty/maritime jurisdiction. *See Craig v. Atlantic Richfield, Co.*, 19 F.3d 472, 475 (9th Cir.1994) (no common law right to jury trial in admiralty cases).

In any event, notwithstanding HSI's failure to invoke admiralty jurisdiction, the Court finds that this dispute does not fall within Section 1333. While HSI relies on *Corna* for the proposition that "[t]he interpretation and enforcement of a maritime contract is governed by federal maritime law," 794 F.Supp. at 1007, HSI cites no authority to support that the HT & T CBAs indeed constitute maritime contracts.

As to this critical issue, *Clinton v. International Organization of Masters, Mates & Pilots of America*, 254 F.2d 370 (9th Cir.1958), is instructive. There, the Ninth Circuit held that alleged breaches of a labor contract did not constitute an admiralty dispute. *See id.* at 372. A seaman brought claims against Local 90 for failure to provide proper allocation of available jobs. *See id.* at 371. The Ninth Circuit reasoned:

> Admiralty jurisdiction is historically a limited jurisdiction.....
>
> The dividing line between cases maritime and non-maritime is not always clearly marked. It is believed that a

---

**3.** The Court notes that in its Complaint for Declaratory and Injunctive Relief filed on September 22, 2004 ("Complaint"), HSI asserts jurisdiction based on 28 U.S.C. § 1331, 28 U.S.C. § 1333, 28 U.S.C. § 2201, 28 U.S.C. § 2202 and 29 U.S.C. § 141 et seq.

sure guide, in matters of contract, is to be found in the relation which the cause of action has to a ship, the great agent of maritime enterprise, and to the sea as a highway of commerce.

Applying this guide to the instant case, the contract herein falls short of the requisites for admiralty cognition. Its relation to a ship is non-existent; its relation to the sea indirect. It falls far below even those cases in which there was some direct relation between the plaintiff and the ship-contracts whose ultimate purposes related to a vessel or to navigable waters but which were held to be contracts merely preliminary to maritime matters. It is, in short, a labor contract, entered into upon the land, to be performed upon the land, and breached, if at all, upon the land. Its relationship to vessels and the sea is at best remote and indirect.

. . . . .

**This is not a maritime case. The mere fact that libellant is a seaman does not convert this dispute into maritime contracts or maritime torts such as to confer admiralty jurisdiction upon this Court.**

*Id.* at 372 (emphasis added).

The Ninth Circuit instructs that determination of whether a contract is within admiralty jurisdiction should be done "not by recourse to generalization as to what is 'maritime', but by looking at case law and comparing the policies with other contracts that have been held to be inside or outside the jurisdiction." *Royal Ins. Co. of Am. v. Pier 39, Ltd. P'ship,* 738 F.2d 1035 (9th Cir.1984). This case, like *Clinton,* involves an alleged breach of a labor contract, i.e. the HT & T CBAs. The Court sees no significant difference, for purposes of analyzing admiralty jurisdiction, between the labor contract of a longshoremen union and its member (*Clinton*), and a labor contract between a longshoremen union

and a stevedoring company (HT & T CBAs). That the dispute is between two stevedoring companies over the price of labor provided by longshoremen does not transform this into a maritime case. *See id.* Notably, the HT & T CBAs do not involve a connection to a specific vessel but rather pertain to the obligations of the labor union and HT & T generally. *Cf. Royal Ins. Co. of Am.,* 738 F.2d at 1037 ("Wharfage contracts are maritime if wharfage is provided to a specific vessel. This is consistent with cases holding contracts to provide other services or supplies to a vessel to be within the jurisdiction. If there is no connection to a specific vessel, however, contracts relating to wharves generally are not within admiralty jurisdiction."). In other words, the subject matter of the HT & T CBAs pertain to labor generally with no direct relation to a particular ship. Accordingly, the Court finds that it does not have jurisdiction of this action under Section 1333.

 Alternatively, even if the Court were to conclude that HSI's claims are cognizable in admiralty, jurisdiction under Section 1333 does not foreclose the Court's discretion to decline jurisdiction under the DJA. *See Phoenix Assurance PLC v. Marimed Foundation for Island Health Care Training,* 125 F.Supp.2d 1214, 1219 (D.Hawai'i 2000) (noting that "[n]either the Supreme Court nor the Ninth Circuit have determined the amount of discretion a district court possesses in deciding whether to exercise jurisdiction in a declaratory judgment action when the court is sitting in admiralty" and concluding that analysis under *Dizol* proper). Thus, the Court will consider the factors set forth in *Brillhart* and *Dizol* to determine whether it should decline DJA jurisdiction under the circumstances of this case.

## II. DECLARATORY JUDGMENT ACT JURISDICTION

 HSI appears to suggest that the Court's decision to decline to exercise jurisdiction under the DJA is erroneous because its "claims are exclusively based upon federal principles of law and are most appropriately within the purview of the federal court system." HSI adds that the Court does not have a sufficient basis to abstain from exercising federal jurisdiction based on the factors enumerated in *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942) (*"Brillhart "*), and in *Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1226 (1998) (*"Dizol "*) because: "Plaintiff HSI's claims are based exclusively on federal law; there are no pending State actions which raise issues identical to those asserted herein; Plaintiff HSI did not bring this action as a means of forum shopping; there is no potential conflict between the federal and state judicial systems where the claims asserted by Plaintiff HSI have never been adjudicated before and are based upon factual circumstances existing as of, and after, August 1, 2004; the State court is not a more convenient forum to either party; and there is no alternate forum in State court currently available to adjudicate Plaintiff HSI's claims." Plt.'s Reply at 11–12. HSI also argues that its "breach of contract claims are not subject to discretionary abstention." *Id.* at 12.

As a preliminary matter, the DJA presumes that jurisdiction is secured by some other grant of federal jurisdiction. *See Dizol*, 133 F.3d at 1222–23 ("If the suit passes constitutional and **statutory muster**, the district court must also be satisfied that entertaining the action is appropriate.") (emphasis added); *see also Phoenix Assurance PLC*, 125 F.Supp.2d at 1219 ("The Declaratory Judgment Act does not itself confer federal subject matter jurisdiction. There must be an independent

basis for such jurisdiction."). Thus, the Court finds HSI's argument that its federal-law based claims are most appropriately within the purview of the federal court system of little consequence.

Next, HSI's argument that its "breach of contract claims are not subject to discretionary abstention" also lacks merit. The heart of HSI's Complaint is its request for declaratory relief; there is no claim for money damages flowing from a breach of contract. *See Snodgrass v. Provident Life & Accident Ins. Co.*, 147 F.3d 1163 (9th Cir.1998) (where request for declaration lies at the heart of action court has discretion to decline jurisdiction under DJA as opposed to a suit for money damages). In other words, the Complaint does not set forth a claim that exists independent of HSI's request for various declarations. *See id.* ("Claims that exist independent of the request for a declaration are not subject to the [DJA's] discretionary jurisdictional rule.").

Finally, as explained in detail in the Order, the Court's discretion under the DJA is guided by the following factors: 1) avoiding needless determination of state law issues; 2) discouraging litigants from filing declaratory actions as a means of forum shopping, and 3) avoiding duplicative litigation. *See id.* at 1225. "Essentially, the district court 'must balance concerns of judicial administration, comity, and fairness to the litigants.'" *Robinson* (citing *Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 144 (9th Cir.1994)). Additional relevant considerations include:

whether the declaratory action will settle all aspects of the controversy; whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue; whether the declaratory action is being sought merely for the purposes of procedural fencing or to obtain a 'res judicata' advantage; or

whether the use of a declaratory action will result in entanglement between the federal and state court systems. In addition, the district court might also consider the convenience to the parties, and the availability and relative convenience of other remedies.

*Id.* (citing *Dizol,* 133 F.3d at 1225, n. 5).

The Court finds that these factors counsel decidedly in favor of declining DJA jurisdiction. HSI stressed, both in its moving papers and at the hearing on the Motion, that "August 1, 2004 ... represents a significant change in circumstances with respect to ... HSI's stevedore operations in Hilo," Reply at 5, and that "[t]here is no active litigation pending in any State court concerning these parties or any claim asserted in this federal case." *Id.* at 6.

The Court carefully considered, among other things, HSI's labor unit in Hilo as of August 1, 2004, and also compared the claims asserted by HSI in this case against the litigation in the First[4] and Second[5] State Court cases. Based on its analysis, the Court concluded, for reasons discussed in detail in the Order, that the potential for entanglement between the federal and state court systems is evident and wise judicial administration counsels in favor of declining jurisdiction. *See* Order at 23. At the hearing on the Motion, HT & T pointed out that in the First State Court case, HSI alleged counterclaims against HT & T for frivolous lawsuit/abuse of process and breach of contract based on HT & T's failure to adhere to the labor loan practice as required by the HT & T CBAs and membership in the SIC. *See* Ex. 13 (HSI Counterclaim, filed on 11/12/03), to Grimmer Decl., filed 1/12/05. That the State Court's dismissal of these claims on summary judgment is currently on appeal to the Hawaii Supreme Court confirms this Court's concern that failure to decline jurisdiction of this case will open the door to entanglement and duplicative litigation. *See* Order at 23–24.

Also, the Court is not convinced that this lawsuit is not at least somewhat motivated by forum shopping on HSI's part. At the hearing on the Motion, counsel for HSI expressed worry that the State Court would turn a "deaf ear" to the CBA argument if raised in the Second State Court case like it had in the First State Court case. As noted in the Order, "allowing an unsuccessful party to a state court proceeding to raise similar arguments that involve re-litigation of issues unfavorably decided in a subsequent action brought in federal court may facilitate forum shopping." Order at 25, n. 19.

Finally, the remedies sought by HSI here are available in state court. *Compare City of Tucson v. U.S. West Communications,* 284 F.3d 1128, 1135 (9th Cir.2002) (declination of DJA jurisdiction abuse of discretion where declaratory relief not available in state court). As discussed, HSI's claims do not fall within federal admiralty jurisdiction, and even if they did, far from affirmatively invoking admiralty jurisdiction, HSI has indicated an intent not to rely on Section 1333 by demanding a jury trial and by failing to raise admiralty as a jurisdictional basis in opposing HT & T's Motion for Summary Judgment. *See* Charles A. Wright, Arthur R. Miller, Edward H. Cooper, Federal Practice and Procedure § 3672 ("A plaintiff who has an admiralty or maritime claim—for example,

---

**4.** *HT & T Co. v. Hawaii Stevedores, Inc.,* Civ. No. 02–1–0148 (Third Circuit Court, State of Hawaii, April 17, 2002).

**5.** *HT & T Co. v. Hawaii Stevedores, Inc.,* Civ. No. 04–1–0336 (Third Circuit Court, State of Hawaii, October 8, 2004).

a claim for damages for breach of a maritime contract—thus has the following options in selecting a forum. First, the claimant may invoke federal admiralty jurisdiction under the grant of original subject matter jurisdiction ... in Section 1333. Neither complete diversity of citizenship nor a minimum amount in controversy need be shown under the statute, but, if alternative bases of federal subject matter jurisdiction exist, the plaintiff must affirmatively invoke admiralty jurisdiction. On the other hand, most plaintiffs will have no right to a trial by jury if they invoke the federal court's general admiralty and maritime jurisdiction."). The Court's jurisdiction of this case lies, if at all, under the LMRA and it is well-settled that state and federal courts have concurrent jurisdiction over Section 301 (LMRA) claims. *See Local 174 v. Lucas Flour Co.,* 369 U.S. 95, 101, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). There is no indication that the state court is not empowered to issue the declarations HSI seeks from this Court.

In short, HSI expresses mere disagreement with the Court's Order and has not demonstrated the need to correct clear error. *See Mustafa,* 157 F.3d at 1178–79.

### CONCLUSION

Based on the foregoing, the Court DENIES Plaintiff's Motion to Reconsider the Order Denying Defendant's Motion for Summary Judgment and Declining Jurisdiction Under the Declaratory Judgment Act, filed January 20, 2005. The Court finds that it does not have jurisdiction of this action pursuant to 28 U.S.C. § 1333 (admiralty) and alternatively, that even if admiralty jurisdiction did lie, the Court would nevertheless decline exercise of jurisdiction under the DJA based on careful consideration of the *Brillhart* and *Dizol*

factors as applied to the circumstances of this case.

IT IS SO ORDERED.